EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALINE FINNEMAN, ) | Deposition of: |
| ) | |
| Plaintiff, ) | Donald McLeish |
| ) | |
| vs. ) | Civil No. |
| ) | 2:19-CV-00327-HCN-CMR |
| DELTA AIRLINES, INC., ) | |
| a Delaware Corporation, ) | Judge Howard C. Nielson, Jr. |
| ) | |
| Defendant. ) | Magistrate Cecilia M. Romero |

VIRTUAL DEPOSITION VIA ZOOM

PAGES 94 THROUGH THE END OF THE DEPOSITION HAVE BEEN
DESIGNATED CONFIDENTIAL

April 29, 2021 * 8:00 a.m.

Witness Location:  Salt Lake City, Utah

Reporter:  Diana Kent, RPR, CRR
Notary Public in and for the State of Utah

1    Q.    What was your date of retirement?

2    A.    July 31st.

3    Q.    Of what year?

4    A.    2020.  Sorry.

5    Q.    I couldn't hear that, what?

6    A.    2020.

7    Q.    So was your title "department manager" or

8  was it "ramp manager"?

9    A.    Department manager.

10    Q.    But you managed the ramp, is what you're

11  telling me, the below-wing operations?

12    A.    Yes.

13    Q.    Tell me, in a bit more detail but not in

14  exhaustive detail, more of a summary, what your job

15  duties and responsibilities were as department manager

16  below-wing.

17    A.    So department manager, there was two

18  department managers below-wing and one department

19  manager above-wing, and it was basically divvied up

20  based on how many people reported to any one department

21  manager.  And I think I had roughly 450 people in my

22  tree, two levels down, and we were responsible for the

23  unloading and loading of aircraft.  I also had the

24  assignment of de-ice operations.  So wintertime, that

25  was seasonal.  It was kind of a lateral responsibility.



 1    Also managed the control tower, which is the inner ramp

 2    area that pilots -- FAA turns the pilot over to us and

 3    we guide them into the gates, and then in reverse we

 4    escort them out to the spots and then turn the pilots

 5    over to the FAA, and we facilitate the to and from of

 6    the aircraft.

 7          Also managed the bag room operation and

 8    the baggage transfer team, which is where I started.

 9    Also had the cargo facility.  Cargo had a manager

10    there, a third-party vendor but I managed the cargo

11    operation, and then something of a liaison the last few

12    years with building the new airport.

13          Q.    Who was the other department manager

14    below-wing along with you?

15          A.    Marc Stetler was my partner for the

16    majority of the time.  And then Marc, I don't know when

17    Marc became the general manager, but Marc was promoted

18    to general manager.  So we were peers, and Marc was

19    promoted to general manager early in 2020 or late in

20    2019.  I couldn't say for sure.

21          Q.    And Stetler is spelled S-T-E-T-L-E-R,

22    right?

23          A.    Yes, sir.

24          Q.    Who was the above-wing manager at that

25    time?



1    A.    Keith Stowe.

2    Q.    And as department manager below-wing, who

3  was your direct supervisor?

4    A.    Who was what?

5    Q.    Your direct supervisor.

6    A.    Marc Stetler.

7    Q.    So did you and Mr. Stowe -- and "Stowe"

8  I'm spelling S-T-O-W-E, does that sound right to you?

9    A.    Yes, sir.

10   Q.    You and Mr. Stowe both reported to

11  Mr. Stetler, correct?

12         MR. DIBBLE:  Objection.  Vague and

13  ambiguous as to time.

14   Q.    I'm talking about the time you served as

15  department manager below-wing.

16   A.    Well, in the final days, no.  Keith would

17  have reported above-wing to, I believe -- I don't know

18  when Kelley Marchant -- Kelley Marchant was an

19  above-wing general manager.  So no, Keith did not

20  report to Marc Stetler.

21   Q.    All right.  And why did you decide to

22  retire in July of 2020?

23   A.    I had been considering retiring for many

24  years.  Delta offered a very lucrative retirement

25  package.



1        Q.    And to be clear, Delta did not terminate

2   your employment; you retired voluntarily, right?

3        A.    Absolutely.  Yes.

4        Q.    And Aline Finneman previously worked for

5   Delta Airlines, correct?

6        A.    Yes.

7        Q.    And she was employed with Delta from 1995

8   until on or about February 3, 2018.  Does that sound

9   right to you?

10       A.    Sounds correct, yes.

11       Q.    And you've met Ms. Finneman before,

12  correct?

13       A.    Yes.

14       Q.    And in 2016, Ms. Finneman accepted a

15  transfer from Texas to Salt Lake City to work as an

16  operations service manager, or OSM, correct?

17       A.    Yes.

18       Q.    And you were Ms. Finneman's direct

19  supervisor, correct?

20       A.    Yes.

21       Q.    How often did you observe Ms. Finneman

22  performing her work; daily, weekly?

23       A.    Ms. Finneman's work was covering a work

24  area, so I wouldn't necessarily be standing and

25  watching her perform her role, but talking to her on a



1  daily basis when she was at work was common.

2      Q.    And how would you describe Ms. Finneman's

3  job duties and responsibilities as an OSM?

4      A.    She was a bag room OSM over a very large

5  team, the afternoon shift, I believe.  Baggage -- bag

6  room, baggage facility makes up all the bags coming in

7  from the ticket counter, and transports them in bags

8  out to departing flights, and two-thirds of the

9  footprint of the bag room.  And they are responsible

10  for all the bags that come off the aircraft and go out

11  to the curb and load them on carousels for terminating

12  customers in Salt Lake as well.

13      Q.    And were you involved in the decision to

14  permit or allow Ms. Finneman to transfer from Texas to

15  Salt Lake?

16      A.    I believe I was.

17      Q.    Did you approve that decision?

18      A.    Yes.

19      Q.    Was anyone else involved?

20      A.    Generally the leadership team, as a group,

21  we interview.  And interview scores make up the lion's

22  share of the decision-making process.  But yeah,

23  certainly I would have had conversation about

24  supporting Aline coming back to Salt Lake City as an

25  OSM.



1      Q.    And why would you support that decision?

2      A.    It's very much a bonus, when you're a

3   department manager, when you have somebody that's

4   already got some leadership skills and experience.  And

5   Aline was coming to us with experience.

6      Q.    Do you recall who else was involved in the

7   decision to allow Aline to transfer?

8      A.    I couldn't tell you.  I'm guessing it

9   would probably be Keith Stowe or Marc Stetler.  I don't

10  recall who was in the interviews with me.  I don't

11  actually -- I'm not a hundred percent sure I was the

12  one who interviewed Aline coming back in.

13     Q.    So to be clear, Aline worked as an OSM

14  below-wing, right?

15     A.    Yes.

16     Q.    And in the time period that Ms. Finneman

17  worked in Salt Lake City, so we are going 2016 to on or

18  about February 3, 2018, that's the narrow time frame

19  I'm asking you about now.

20     A.    Yeah.

21     Q.    Who were the other OSMs that you

22  supervised?

23     A.    The bid -- OSMs bid over six months in and

24  out of a work area.  So I'm not sure if Aline fell

25  under my oversight for that entire duration.  I don't



 1  know how often she was in my -- we called it a tree, a

 2  leadership tree or hierarchy.  I couldn't tell you

 3  exactly.

 4       Q.    Okay.  Do you remember any of the other

 5  OSMs you supervised in your tree in that time period?

 6       A.    Sure, yeah.

 7       Q.    Who are they?

 8       A.    Todd Monette, Dixie Jimenez, Ken Webb.  I

 9  don't have a roster directly in front of me, but there

10  was about 26, 28 total leaders.

11       Q.    And Monette would be spelled M-O-N-E-T-T-E,

12  right?

13       A.    Uh-huh (affirmative).

14       Q.    Is that a yes?

15       A.    Yes.  Sorry about that.

16       Q.    And you knew that Ms. Finneman was

17  originally from the Philippines, correct?

18       A.    I don't know that it ever came --

19             MR. DIBBLE:  Objection.  Assumes facts not

20  in evidence.

21       Q.    You can answer.

22             MR. DIBBLE:  You can answer.

23       A.    I don't know -- I don't necessarily know

24  that Aline was born in the Philippines.  I don't have

25  any idea where she grew up.



1      Q.    Did you know she was of Asian descent?

2      A.    Sure.

3      Q.    Obviously you knew the color of her skin?

4      A.    Uh-huh (affirmative).  And she talked

5   about her parents having a place in the Philippines, I

6   believe.

7            MR. DIBBLE:  And Don, will you say yes or

8   no instead of "uh-huh"?

9            THE WITNESS:  Yes.  Sorry.

10     Q.    (By Mr. Egan ) What did she tell you about

11  her parents in the Philippines?

12     A.    Other than her parents lived in the

13  Philippines and she had gone there to visit them, I

14  don't recall anything else.

15     Q.    And did Aline have an office at Delta?

16     A.    Yes.

17     Q.    And where was that in proximity to yours?

18     A.    Distance-wise, a couple hundred yards,

19  probably, away.

20     Q.    At the airport, right?

21     A.    A walk of -- a three- or four-minute walk,

22  yeah.

23     Q.    At the airport, right?

24     A.    Yes, sir.

25     Q.    And this would be the old Salt Lake City



1    airport, right?  We now have a brand new terminal out

2    there, so I'm talking about the old airport.

3         A.    Yes, sir.

4         Q.    That's what you're talking about too,

5    right?

6         A.    Yes, sir.

7         Q.    All right.  What part of the old -- it was

8    terminal 2, I believe.  Is that where the offices were?

9         A.    Yes, sir.

10        Q.    All right.  And how would you assess

11   Ms. Finneman's job performance?  Was she effective,

12   ineffective?

13        A.    Effective.

14        Q.    Okay.  Why would you say that?

15        A.    She was a good leader.  I enjoyed having

16   Aline on my team.

17        Q.    What made her a good leader?

18        A.    She cared about her team.  She took good

19   care of the employees that were under her direct

20   oversight.  She was very responsive and responsible and

21   communicated well with me on items that were going on.

22   I had no issues with performance.

23        Q.    And did you issue her any types of formal

24   performance evaluations?

25        A.    We do on-tracks and one-on-one check-in.



1  On-track discussions and one-on-one check-ins with

2  leaders.

3      Q.    How many on-track discussions did you have

4  with her?

5      A.    Well, they were annual.  So the on-track

6  discussions were beginning of the year, you would sit

7  down and have conversations about what their goals

8  were.  You tried to have midyear conversation, as well,

9  and then year-end conversations, as well, with the

10  entire leadership team.

11      Q.    Were those on-track discussions documented

12  in any way?

13      A.    Yes.

14      Q.    And those on-track discussions include

15  things like performance scores like 1 to 10 or 1 to 5

16  in various areas of performance?

17      A.    I think they were more of a "meeting

18  expectations," "exceeding expectations."  I think they

19  were something like that.  The tool we used to measure

20  performance over the years has changed, so on-track was

21  something that we were only a year or two into it and

22  it really didn't work quite as well as we were hoping

23  it would, but there was some type of measurement in

24  there.

25      Q.    How many of these one-on-one discussions



1  did you have with Aline?

2      A.    You know, I think our target was to try to

3  have them every month, month and a half.  But given the

4  size and scope of the operation and the new airport

5  being built, I think we were lucky to have them every

6  two months.

7      Q.    Did you ever have to -- I'm sorry.  Were

8  you --

9      A.    I was just asking if I could get a bottle

10 of water.  Sorry.

11     Q.    I'll wait for Dave to come back.

12          MR. DIBBLE:  I'm here.  Go ahead.

13          THE WITNESS:  Thank you, sir.

14     Q.    Did you ever have to issue any type of

15 written warning or any type of written performance

16 discipline to Aline?

17     A.    No.

18     Q.    Did you ever place Aline on any type of

19 performance improvement plan?

20     A.    No.

21     Q.    Did you ever place her on any type of

22 suspension or probation?

23     A.    No.

24     Q.    Do you recall whether you approved any

25 type of pay increase for Aline?


CitiCourt
THE REPORTING GROUP

1        A.     Not that I'm aware of, no.

2        Q.     Let's take a look at what has previously

3   been marked as Exhibit 21, so we don't need to mark it

4   again.  Let me know when you have it before you,

5   Mr. McLeish.

6        A.     Yes, sir.  I've got it in front of me.

7        Q.     Have you seen that document before today?

8        A.     Yes.

9        Q.     What is it, exactly?

10       A.     Kind of a timeline on how events occurred

11  related to the incident at the ticket counter with

12  Aline.

13       Q.     Did you create this document or did

14  someone else create it?

15       A.     I definitely input stuff into this.  It

16  looks familiar, but I couldn't say for certain if I

17  created it or not.

18       Q.     Do you know when it was created?

19       A.     I do not.

20       Q.     Do you know why it was created?

21       A.     I think it was due to -- I think it was to

22  give a timeline why there was a stall with Aline having

23  been on vacation.  And just a timeline on -- because I

24  think it took longer, really, to circle back around to

25  parties than we hoped.  So I think it was a snapshot of



1    Q.    And tell me about this meeting with Aline

2  on January 5.  Where was it?

3    A.    I don't know if that was in person or on a

4  phone call, but it would have been me asking for

5  additional details, basically reading the other

6  statements that implied there was more dialogue about

7  waiving bag fees than Aline had provided in her

8  previous statements.

9    Q.    Was anyone else present for the

10  conversation or the phone call?

11    A.    I don't believe so, no.

12    Q.    Did you record the conversation?

13    A.    No, sir.

14    Q.    Do you recall specifically what Aline told

15  you during this January 5 exchange?

16    A.    I do not.

17    Q.    Do you recall what you told her?

18    A.    Other than needing more information, some

19  explanation of why we were seeing differing content in

20  the stories.

21    Q.    And have you told me everything you

22  remember about the January 5, 2018 conversation with

23  Aline?

24    A.    Yes, sir.

25    Q.    When it states that her statement differed



1    from other versions of what occurred, how is it

2    different?

3        A.    Aline had not clarified or covered the

4    overweight bag, and the allegations that other

5    statements made regarding her asking them to waive --

6    get in the computer and waive the bag fees for her two

7    bags, I believe it was.

8        Q.    Other statements from whom?  Ms. Alusa?

9        A.    Yes.

10       Q.    Ms. Alusa.

11       A.    Well, at that point I think it might

12   have -- I'm not sure if I had even seen Ms. Alusa's

13   statement at that point, but what we were hearing

14   verbally from Roland and Cory, I believe their

15   conversations with Keith Stowe.  So trying to get at

16   the bottom of it.

17       Q.    And "Cory" is Cory Abbott, right?

18       A.    Yes, sir.

19       Q.    And then there's an entry on January 6.

20   Just read that to yourself, if you would, please.

21       A.    Okay.

22       Q.    Let's take a look at Exhibit 26.

23       A.    Exhibit 26.  Okay.

24       Q.    This would be an e-mail from Ms. Finneman

25   dated January 6, 2018 to you.  The subject line reads



1    "statement."  Are we looking at the same document?

2        A.    Yes.

3        Q.    Take a moment to read or review the e-mail

4    to yourself and then I'd like to ask you a few

5    questions about it.

6        A.    Okay.  I've read it.

7        Q.    All right.  In the first paragraph Aline

8    states she attempted to check in online but was

9    unsuccessful.  So when she got to the airport, she

10   decided to go straight to an agent and was assisted by

11   Niki.  She then states, "I stepped away for a little

12   bit to look for an envelope to store IDs and RFT

13   paperwork."  Was it your understanding that Aline got

14   to the ticket counter, and then left the ticket

15   counter, and then came back to the ticket counter

16   before she checked herself in?

17       A.    That would be my understanding, yes.  But

18   not necessarily left the ticket counter.  Left the

19   ticket counter position.  I believe she walked down a

20   few positions and came back again.  I believe she still

21   remained at the ticket counter.

22       Q.    So from the time Aline arrived at the

23   ticket counter at about 7:17 a.m., she didn't leave the

24   view of the camera or leave the ticket counter and come

25   back; she stayed at the ticket counter until she was



Donald McLeish  *  April 29, 2021

1  checked in.  Would that be correct?

2      A.    I believe so.

3      Q.    So then Aline states she stepped away for

4  a little bit to look for an envelope, is it your

5  understanding that by "stepping away," that means she

6  didn't step away from the ticket counter, she just

7  stepped away from the particular agent.  Correct?

8      A.    That particular check-in position, yes.

9      Q.    And in the first paragraph of her e-mail

10  Aline refers to, "People here will not help/waive

11  because of," I believe it is pronounced "you-een-ee,"

12  U-I-N-I.  Do you see that?

13      A.    I do.

14      Q.    Do you know who Uini is?

15      A.    I know who the lady is.  I believe it is

16  "Winney," but I don't know what the -- I don't know

17  what that is referring to.  I probably knew at the

18  time, but I don't -- I wasn't part of the

19  investigation.  I don't really know what happened to

20  Uini.

21      Q.    Do you remember Uini's last name?

22      A.    I do not know Uini's last name.

23      Q.    Do you know what her job title was?

24      A.    I believe she was a ticket counter

25  employee.




1          Q.    Do you know whether her employment was

2   terminated?

3          A.    I don't know.

4          Q.    And did you ultimately conclude that Aline

5   made statements in this e-mail that were false?

6          A.    Yes.

7          Q.    Could you identify what you concluded to

8   be false?

9          A.    Yes.

10         Q.    Please do so.

11         A.    I believe there was an inquiry to getting

12  into the computer and waive the overweight bag fees,

13  based on the statements I read.

14         Q.    Anything else you believe to be false?

15         A.    I don't -- I'm not sure the bags were ever

16  rearranged but I don't know that she is saying that

17  they did, necessarily.  I think she was making an

18  assumption that her kids -- or an allegation that her

19  kids rearranged the bags.  But I'm not sure that the

20  bags were re-arranged, either, based on what I saw in

21  the camera.

22         Q.    Any other statements you consider to be

23  false?

24         A.    Not that I'm aware of, no.

25         Q.    So when Aline states near the end of her



1  e-mail, the second-to-the-last paragraph, that she did

2  not ask for waivers, "As evident in our ability to move

3  bag weight around prior to checking bags," that's what

4  you concluded was her false statement.

5       A.    I believe that is false.

6       Q.    And you believe that was false because of

7  what you were told by Mr. Abbott, Ms. Alusa, and

8  Ms. Tonga?

9       A.    Abbott, Alusa, Navarro, I'm not sure about

10  Tonga, I don't believe was there.

11       Q.    Let's take a look back at Exhibit 21.

12  Take a look at the entry for January 12, if you would,

13  please.

14       A.    Okay.

15       Q.    It refers to, "Lobby PSA Cory Abbott

16  provided statement advising that Aline had asked him to

17  waive her overweight bag fees.  Cory advised that Niki

18  Alusa expressed frustration that Aline put 50 pounds in

19  the computer to waive fees."  Do you see that?

20       A.    I do.

21       Q.    And on the second page there's an entry

22  for January 20, four entries for January 20.  I'd like

23  to start with the first one where it refers to, "PSA

24  Cory Abbott, when asked again about how much the bags

25  weighed, advised he believed the bags were 65 and 56



1    pounds."  Do you see that?

2        A.    Yes, sir.

3        Q.    Did you write those statements or did

4    someone else?

5        A.    I'm not certain.

6        Q.    Did you meet with Mr. Abbott on January

7    12?

8        A.    I don't believe so, no.

9        Q.    So when it states, "When asked again," who

10   was doing the asking?

11       A.    I would assume it was Keith Stowe, but I

12   couldn't say for certain.

13       Q.    Did you ever speak with Mr. Abbott

14   face-to-face or over the phone about the December 17th

15   incident?

16       A.    Not that I recall, no.

17       Q.    Let's take a look at Exhibit 22.  This

18   would be an e-mail from Mr. Abbott.  The date is

19   January 20, 2018, the e-mail is to you, and the subject

20   line reads, "Ticket Counter Finneman."  Are we looking

21   at the same document?

22       A.    We are.

23       Q.    Take a moment to read and review that

24   e-mail just so you have some context, and then I'd like

25   to ask you about it.



Donald McLeish  *  April 29, 2021

1     A.     Okay.

2     Q.     Did you ask Mr. Abbott to send you this

3  e-mail?

4     A.     I don't believe so.  I suspect I probably

5  asked Maria Tonga to ask for a statement.

6     Q.     In the e-mail Mr. Abbott refers to Kit

7  Keller.

8     A.     Yes.

9     Q.     Who is that?

10     A.     He is a ramp employee that comes out to

11  the counter and checks on the bag status, bag hygiene,

12  to see if the ticket counter people need anything.  I

13  believe he -- I'm not sure if he is on Aline's team and

14  works a lot of overtime on a.m. shift, or if he was

15  a.m. shift and works p.m.  He works a lot of hours so

16  it's hard to say if he is there on a.m. or p.m. shift,

17  but he is there frequently.

18     Q.     Did you speak with Mr. Keller directly

19  about the December 17th incident?

20     A.     No.  Not that I recall.

21     Q.     Why not?

22     A.     Because we had multiple other statements

23  that all stated the same thing and painted the same

24  picture that were all very consistent to one another.

25     Q.     Was it your understanding that Mr. -- is



Donald McLeish  *  April 29, 2021

1   it a Mister or Miss Keller?

2        A.    Mister.

3        Q.    Was it your understanding that Mr. Keller

4   observed the December 17th incident or not?

5        A.    It looks like, similarly to the redcoats,

6   that he traversed back and forth through the area but

7   it doesn't look like he sat and heard the whole

8   conversation like Niki Alusa and Geoffrey Wilde,

9   sitting next to Aline -- or Niki Alusa.  Or had nearly

10  the engagement of the other two redcoats.

11       Q.    Did you ever ask Mr. Keller to submit a

12  written statement about what he knew about the December

13  17th incident?

14       A.    I don't believe so.

15       Q.    And when I ask you why, your answer would

16  be the same?  You felt like you already had enough

17  information?

18       A.    Yes, sir.

19       Q.    The reference to position 13 in

20  Mr. Abbott's e-mail, do you see that?

21       A.    Yes.

22       Q.    Does that refer to that specific terminal

23  where people are getting checked in?  Is that --

24       A.    Yes.

25       Q.    -- what position 13 refers to?



1      Q.    Ms. Alusa would be considered above-wing,

2   right, because she interacted with customers?

3      A.    Yes, sir.

4      Q.    So Ms. Alusa was not supervised by

5   Ms. Finneman.  She was supervised by Mr. Stetler?

6      A.    No.  Ms. Alusa would have been Mr. Stowe.

7   So Mr. Stowe would have been the department manager,

8   but her immediate supervisor would have been Maria

9   Tonga.

10      Q.    Okay.  Let's take a look at Exhibit 19.

11   This would be an e-mail from Niki Alusa, the date is

12   January 20, 2018, to you with a carbon copy to

13   Mr. Stowe.  The subject line reads, "Incident Sunday,

14   December 17, 2018."  Do you see that?

15      A.    Yes.

16      Q.    And did you ask Ms. Alusa to send you this

17   e-mail?

18      A.    I believe I did.

19      Q.    Now, this e-mail is dated January 20.

20   That's more than a month after the incident occurred.

21   Do you know why you waited so long to ask her to send

22   you this?

23      A.    I do not, other than I don't know if she

24   had a lot of days off in the middle there.  We didn't

25   really start it, start grabbing a ton of statements



Donald McLeish  *  April 29, 2021

1    until Aline returned and we went back and played some

2    back-and-forth, based on people's days off and time off

3    really slowed the investigation down.

4         Q.   All right.  And did you meet with

5    Ms. Alusa and speak with her about the December 17

6    incident before she sent you this e-mail?

7         A.   I believe I did.

8         Q.   Do you recall where that meeting was?

9         A.   I do not recall where it was, no.

10        Q.   Was anyone else present?

11        A.   I don't recall.  If there was, I certainly

12   don't remember.

13        Q.   Do you recall how long the meeting lasted?

14        A.   Probably, at a recollection, ten minutes.

15   Five or ten minutes.

16        Q.   Did Ms. Alusa tell you anything during

17   that meeting that is not documented on her e-mail?

18        A.   Not that I'm aware.  But I probably would

19   need to read this again.

20        Q.   Take your time and read it.  I don't want

21   to --

22             MR. DIBBLE:  Are we at a good time to take

23   a break?

24             MR. EGAN:  Sure.  We can take a break.

25             MR. DIBBLE:  All right.  Thank you.





Donald McLeish  *  April 29, 2021                                       63

 1            MR. EGAN:   Let's reconvene how about at

 2   10:02, 10:03, around there.

 3            MR. DIBBLE:   Sounds goods.

 4            (Break taken from 9:54 to 10:04 a.m.)

 5       Q.   (By Mr. Egan)  Mr. McLeish, do you

 6   understand that you are still under oath?

 7       A.   Yes, sir.

 8       Q.   Before we broke, I had asked you about

 9   Exhibit 19.  This would be an e-mail from Niki Alusa,

10   and I was asking you about an in-person or telephone

11   conversation you had with Ms. Alusa.  And I believe you

12   don't recall whether you spoke with her in person or

13   via telephone.  Would that be right?

14       A.   I believe I spoke with her in person, but

15   I couldn't say for dead certain.

16       Q.   Gotcha.  And in your meeting with

17   Ms. Alusa, did she tell you anything that she did not

18   list in her e-mail on Exhibit 19?

19       A.   Not that I recall, no, sir.

20       Q.   All right.  Does Ms. Alusa's sister also

21   work for Delta Airlines?

22       A.   I couldn't tell you who that was, but I

23   have heard that she's got a sister that works for Delta

24   Airlines.

25       Q.   And do you know whether her sister's



1    employment was terminated by Delta?

2         A.    I do not know that.

3         Q.    Did you share Ms. Alusa's e-mail here in

4    Exhibit 19 with Ms. Finneman and ask her to respond to

5    it?

6         A.    I would not have shared the detail -- not

7    just sent her this statement, no.

8         Q.    Why not?

9         A.    We don't do that as part of our

10   investigation.

11        Q.    Is that a written policy or unwritten

12   policy?

13        A.    Boy, I couldn't say for sure.  I've been

14   in leadership a long time.  We never just hand somebody

15   somebody else's statement and ask them to respond to

16   it.

17        Q.    And it's your testimony you don't

18   understand why that policy is in place?

19        A.    I believe it's to protect the individuals.

20   I mean, as I read Niki's statement here, she mentions

21   being worried about retaliation, and Aline having

22   friends.  I think it's just to not damage work

23   relationships by handing statements that somebody said

24   back and forth.

25        Q.    And did Ms. Alusa tell you why she feared



1   retaliation?

2        A.    No, she did not.  She just didn't want any

3   trouble at work.

4        Q.    And in her e-mail, toward the end

5   Ms. Alusa states she feels like she is being punished

6   for doing her job.  Did she tell you why she felt like

7   she was being punished?

8        A.    She wasn't being punished, as far as I'm

9   concerned.  I'm sure I conveyed that.

10       Q.    Yeah, you're not a mind reader.  I

11  wouldn't ask you to decipher what Alusa was thinking.

12  But did she tell you why she felt like she was being

13  punished?

14       A.    No, sir.

15       Q.    Okay.  And in the course of your

16  investigation, you ultimately concluded that

17  Ms. Alusa's version of events on December 17 were more

18  credible than Aline's version of events.  Would you

19  agree?

20       A.    Yes.

21       Q.    How did you arrive at that conclusion?

22       A.    Face-to-face interviews and reading of

23  statements.  Ms. Alusa was very convincing.  I believe

24  what Ms. Alusa shared with me is what occurred.

25       Q.    And you ultimately concluded that



1  Mr. Abbott's statements to you were more credible than

2  Ms. Finneman's statements to you, correct?

3      A.    As they supported Niki's and Roland's

4  similar statements, yes.

5      Q.    But Roland didn't personally observe what

6  happened, right?

7      A.    I think Roland was in the area, but I

8  think Roland made some comments.  He sent the e-mail to

9  Keith Stowe that said, "Aline stated to me that the

10 agent probably got in trouble before and thus wouldn't

11 do it for her."  I think we probably should have asked

12 Roland to expand a little more on that.  But he was in

13 the vicinity, similar to Kit Keller.  They traversed

14 the area, but I don't think they had nearly the

15 firsthand visibility that Niki did.

16     Q.    Are there any other reasons that you

17 concluded that Ms. Alusa's statements regarding the

18 December 17th incident are more credible than Aline's?

19     A.    No.  Just more believable.

20     Q.    Let's go back to Exhibit 21, please, the

21 fourth entry.  And we are on page 2, Mr. McLeish.  The

22 fourth entry for January 20 refers to OSM Maria Tonga

23 being interviewed.  Would you read the comments in that

24 box to yourself and let me know when you're done.

25     A.    Yes.



1      Q.    Did you write the statements in that box?

2      A.    I don't recall, sir.

3      Q.    Did you interview Maria Tonga?

4      A.    I don't believe I did.

5      Q.    Do you know who did?

6      A.    I don't.  I assume it would be Keith, but

7   I don't know.

8      Q.    And why didn't you interview Maria Tonga?

9      A.    Maria Tonga wasn't at the counter when it

10  occurred.

11     Q.    Let's take a look at Exhibit 23.  This

12  would be an e-mail from Maria Tonga.  The date is

13  January 20.  It is to you.  The subject line reads,

14  "Here it is."  Have you seen this e-mail before today?

15     A.    I suspect I have, yes.

16     Q.    What was Maria Tonga's job title at the

17  time she sent this?

18     A.    She was an OSM, so operations service

19  manager, at the ticket counter.

20     Q.    Above-wing?

21     A.    Yes, sir.

22     Q.    And in the first sentence of her e-mail

23  she states, "Hello, Don, per our conversation today

24  here what is I remember in regards to Aline Finneman

25  and her recent standby travel."  End of quote.  Do you



1  see that?

2       A.    I do.

3       Q.    Does that refresh your memory at all about

4  whether you spoke with Ms. Tonga about Aline's travel

5  on December 17th?

6       A.    Yes, sir.

7       Q.    And where did this conversation occur?

8       A.    I think it was a phone call.  I think it

9  was me trying to follow up and get statements for

10  people that had some level of visibility that day.  So

11  it was probably a phone call saying, "Hey would you

12  mind sending me -- I know you weren't there first hand

13  or it doesn't appear you were there first hand, but

14  send me everything you know about it," as part of the

15  investigation.  I don't recall a long conversation with

16  Maria, but I clearly asked for her side of it, what

17  occurred.

18       Q.    Ms. Tonga refers to what Cindy Dunn told

19  her.  Who is Cindy Dunn?

20       A.    A front line customer service agent.

21       Q.    Did you speak with Ms. Dunn about the

22  December 17 incident?

23       A.    Not that I recall, no.

24       Q.    In her e-mail, Ms. Tonga refers to there

25  being a lot of concern.  And this would be the second



1   paragraph.  "A lot of concern about the recent

2   termination of two employees that agents are hesitant

3   to make decisions that they feel require supervisor

4   approval."  Do you see that?

5        A.    I do.

6        Q.    Did you understand which two employees she

7   was referring to who were terminated?

8        A.    No, sir.

9        Q.    Did you ask her to clarify who those two

10  employees were?

11       A.    No.  I may have known about it at the

12  time, but again, I would assume one was the Uini that

13  was referenced in some earlier information we went

14  over, but I don't know who the second one would have

15  been.  I'm assuming Uini was the one.

16       Q.    Do you know why those two employees were

17  terminated?

18       A.    I do not.

19       Q.    And it's fair to say you were not the

20  management level employee who made the termination

21  recommendation for those two employees, right?

22       A.    Correct.

23            MR. DIBBLE:  Just for the record, if you

24  let him finish then you guys don't talk over each

25  other.



1        THE WITNESS:  Sorry, sir.

2        Q.    (By Mr. Egan)  Did you share Ms. Tonga's

3   e-mail with Aline and give her an opportunity to

4   respond to it?

5        A.    No.

6        Q.    I think I know your answer but I'll ask

7   anyway.  Why?

8        A.    Because we don't share -- they were peers.

9   They were both OSMs.  And even if they weren't OSMs, we

10  don't share statements with the other party.  We may

11  have a conversation verbally and ask them to expand on

12  something, but that's not part of how we do the

13  investigations.

14       Q.    All right.  Let's take a look back at

15  Exhibit 21, if you would, please.  The entry for

16  January 24 refers to, "Last day worked, suspended, MSS

17  transaction completed."  Do you see that?

18       A.    Yes, sir.

19       Q.    And then the box next to that states, "Met

20  with Aline to advise of the decision to review

21  employment."  Do you see that?

22       A.    Yes.

23       Q.    Did you enter those comments?

24       A.    I suspect I did.

25       Q.    What does "MSS transaction" refer to?



 1          A.    MSS is the transaction in our -- I don't

 2    know if it's payroll system but it's our master system

 3    that would reflect somebody no longer active.

 4          Q.    And so it was your decision to suspend

 5    Aline as of January 24, 2018, correct?

 6          A.    It was collaborative.  It would have been

 7    my having conversation with Tony Klekas, Kelley Nabors,

 8    Marc Stetler, Keith Stowe.

 9          Q.    Were you all in agreement that Aline

10    should be suspended or was there someone who disagreed?

11          A.    I think at the end of the meeting we had

12    to all be in agreement.  We were all in agreement.  But

13    I'll tell you, Aline was an amazing supervisor for me,

14    so it was with heavy heart that I agreed.  But yes, we

15    would have been in agreement.

16          Q.    And why was she placed on suspension?

17          A.    Based on investigation outcome.

18          Q.    What about the investigation justified

19    suspension?

20          A.    The statements, believing we had the

21    story.

22          Q.    "Statements" meaning statements from

23    Ms. Alusa, Mr. Abbott, Ms. Tonga, and Mr. Navarro?

24          A.    Yes.

25          Q.    Any other statements?





1      A.    No, sir.

2      Q.    Was Ms. Finneman's suspension paid or

3  unpaid?

4      A.    Unpaid, I believe.

5      Q.    And then did you also meet with her on

6  January 24?

7      A.    I'm not sure if that was a face-to-face

8  meeting or not.

9      Q.    Did you speak with her on January 24?

10     A.    I believe I did, yes.

11     Q.    And what exactly did you tell her?

12     A.    I couldn't tell you exactly what I told

13  her.

14     Q.    Do you recall what she said during that

15  conversation?

16     A.    I don't.

17     Q.    Was anyone else present for the

18  conversation?

19     A.    Not that I'm aware of, no, sir.

20     Q.    Did you record the conversation?

21     A.    No, sir.

22     Q.    Have you told me everything you recall

23  about this conversation?

24     A.    Yes.

25     Q.    Let's take a look at a new exhibit,



1  Exhibit 45.

2          (EXHIBIT 45 WAS MARKED.)

3      Q.    It's a two-page exhibit, starts with Bates

4  number Delta 1466.  It is an e-mail from Mr. Klekas --

5  I'm sorry, to you from Mr. Klekas on January 24.  The

6  subject line reads "Aline Finneman meeting."

7      A.    Yes, sir.

8      Q.    Did you send this e-mail?

9      A.    I did.  This is why I sit down and write

10  notes, so yes.

11      Q.    And it states, "Summary of meeting with

12  Aline Finneman."

13      A.    Yes, sir.

14      Q.    Why did you send this e-mail?

15      A.    Because I can't trust my memory, so I want

16  to have a summary of items that occur for reference

17  later, or to have other people that are part of the

18  decision-making process involved.

19      Q.    Does this e-mail refresh your recollection

20  as to whether you met Aline in person, or over the

21  phone, or how long the meeting lasted?

22      A.    Absolutely, yes.

23      Q.    Okay.  So was it an in-person meeting?

24      A.    Yes.

25      Q.    Do you recall where it was?



1    A.    Probably in my office.  I don't know for

2  sure.

3    Q.    Was anyone else present?

4    A.    I don't believe so.  Not that I'm aware

5  of.

6    Q.    In the first paragraph of your e-mail, you

7  state that, "I told her that I had had a chance to

8  investigate further and that my research does not

9  support her version of what occurred."  Do you see

10  that?

11    A.    I do.

12    Q.    And what exactly was your research?  Have

13  you already told me all the research you did?  Is there

14  additional research you conducted?

15    A.    No.  The statements, reading statements

16  and talking to individuals that were there.

17    Q.    And watching the video, right?

18    A.    Sure.  Yes.

19    Q.    And meeting with Ms. Finneman, right?

20    A.    Right.  Yes.

21    Q.    In the next paragraph you state that you

22  asked Aline if she had "adjusted the bag weights in the

23  computer to reflect 50 pounds, and she said that she

24  did, but did not double-check to make sure the kids

25  moved the weight in the bags."  Do you see that?



Confidential
Donald McLeish  *  April 29, 2021                                    75

1        A.      I do.

2        Q.      So did you conclude that when Aline

3   entered the two bag weights at 50 pounds, did you

4   conclude that she made a mistake or did you conclude

5   that she deliberately entered that weight knowing they

6   were overweight?

7        A.      Knowing they were overweight, entered

8   those false numbers.

9        Q.      So you concluded that Aline had intent to

10  falsify two bag tags, right?

11       A.      The weight on two bag tags, yes.

12       Q.      And if I were to ask you why you believed

13  she intentionally falsified those records, your answer

14  would be the same:  Based on what you had heard from

15  Mr. Navarro, Mr. Abbott, Ms. Tonga, and Ms. Alusa,

16  correct?

17       A.      Yes.

18       Q.      So between December 17, 2017 and the date

19  that you sent this e-mail on January 24, have you told

20  me all the actions you took to investigate what

21  occurred on December 17th?

22       A.      I believe so, yes.  To the best of my

23  knowledge, for certain.

24       Q.      Let's take a look at Exhibit 46.

25               (EXHIBIT 46 WAS MARKED.)





1        Q.    All right.  This will be a new exhibit, we

2    will need to mark it.

3              It is an e-mail -- well, there's a couple

4    of e-mails. Both of them are from you.  The first

5    e-mail is dated January 21, the second e-mail is dated

6    January 24.  And the exhibit is two pages long with a

7    Bates number of Delta 199 and Delta 200.  Are we

8    looking at the same document, sir?

9        A.    I believe we are, yes, sir.

10       Q.    All right.  Let's start with your e-mail

11   of January 21 that you sent to Mr. Klekas and

12   Ms. Nabors.  And you state that you printed statements

13   from Ms. Finneman, Ms. Alusa, Ms. Tonga, Mr. Abbott,

14   and Mr. Navarro.  And have we already looked at those

15   statements today or are there additional statements

16   that you are referring to?

17       A.    To the best of my knowledge we have looked

18   at them all today.

19       Q.    You state that after viewing cameras you

20   needed to obtain statements from Kit Keller, Geoffrey

21   Wilde, and Ping Woo, P-I-N-G, W-O-O.

22       A.    Yes.

23       Q.    We have gone over Kit Keller.  Who is

24   Geoffrey Wilde?

25       A.    I believe he was an agent that was



1   directly across the -- there's a scale bay in between

2   two positions.  I believe he was the agent that was

3   next to her over there, next to Niki Alusa.

4        Q.    Did you speak with Mr. Wilde about the

5   December 17 incident?

6        A.    I don't believe I did, no.

7        Q.    Did you obtain a statement from Mr. Wilde?

8        A.    I don't believe I saw one, no.

9        Q.    And why did you not speak with Mr. Wilde?

10       A.    I suspect at that point we had enough

11  statements.  It would have been, again, some

12  collaboration with my boss and my boss's boss and human

13  resources to say that we had enough statements and we

14  didn't need to obtain any more.

15       Q.    And if I were to ask why you did not

16  obtain a written statement from Mr. Wilde, your answer

17  would be the same?

18       A.    Yes, sir.

19       Q.    Who is Ping Woo?

20       A.    I believe she was out at the front check-

21  in, the front of the stanchions when Aline came in the

22  door, and kind of whisked her up to the front of the

23  line because they were flirting with the cutoff time

24  for international bags.

25       Q.    What is the cutoff time for international



1  bags?

2       A.    I think it's an hour, at a guess.  I

3  couldn't say for certain, but I believe it's sixty

4  minutes.

5       Q.    So if you arrive at the airport sooner

6  than -- within that one-hour cutoff time, you don't get

7  to check a bag for an international flight; is that

8  correct?

9       A.    I believe the automation actually prevents

10  it, I think.  Or makes it a lot more difficult, if it

11  doesn't prevent it altogether.

12       Q.    Did you speak with Ping Woo about the

13  December 17 incident?

14       A.    No, sir.

15       Q.    Why?

16       A.    Ping's involvement was pretty minimal.

17  Taking her to the front of the line, it appeared by the

18  cameras, and then back out again.  I think she returned

19  back to her position.  I'm not certain, but I don't

20  believe she was witness to any of this.

21       Q.    And if I asked you why you did not obtain

22  a written statement from Ping Woo, your answer would be

23  the same?

24       A.    Yes, sir.

25       Q.    And in your e-mail of January 21, why did



1  you state that you needed to obtain statements from

2  those three?

3      A.    I think at some point I was obviously

4  planning on obtaining statements.  But at some point

5  during the investigation it was deemed not necessary.

6      Q.    And in that same e-mail you state that you

7  put together a timeline starting at 7:17 and ending at

8  7:28.  Do you see that?

9      A.    Yes, sir.

10      Q.    Did you create that timeline purely by

11  viewing the video footage?

12      A.    I believe so, yes.

13      Q.    But just to be clear, the video footage

14  would not contain audio, right?  Just video?

15      A.    Correct.  Just video.

16      Q.    Let's take a look at Exhibit 47.  This

17  would be a new exhibit.  We will need to mark it.

18            (EXHIBIT 47 WAS MARKED.)

19      Q.    The Bates number is Delta 656.  It is a

20  one-page exhibit, an e-mail from you to Mr. Klekas,

21  followed by Mr. Klekas's response.  Are we looking at

22  the same document, sir?

23      A.    Yes, we are.

24      Q.    In your e-mail to Mr. Klekas you state

25  that we are pursuing RFT, and you wanted to send it for



1   approval.  What is RFT?

2        A.    Request for termination.

3        Q.    Could you have terminated Ms. Finneman's

4   employment without getting approval from Mr. Klekas?

5        A.    No.

6        Q.    Did you need approval from anyone else?

7        A.    Human resources, I believe, as well.

8        Q.    So that would be Ms. Nabors?

9        A.    And probably Ms. Nabors's boss.

10       Q.    And that would be Mr. Jessup?

11       A.    I would assume -- that's me assuming it

12  would be Mr. Jessup.  But it goes to Atlanta.  I think

13  there's a third party that reviews the details.

14       Q.    Is it fair to say that as of January 28,

15  when you sent this e-mail, you had made up your mind

16  that you would like to terminate Ms. Finneman's

17  employment?

18       A.    Based on meetings with the leadership team

19  in Salt Lake, yeah.

20       Q.    And why did you believe termination was

21  appropriate?

22       A.    Because of the waiving of the fees, the

23  fact that we believed the other statements on the

24  waiving of the bag fees without any adjustments in

25  weight.



1    Q.    Why not issue a written warning instead of
2  termination?
3    A.    Captive services is a big deal with Delta,
4  and waiving fees that would otherwise generate revenue
5  for Delta, that's taken very seriously.
6    Q.    At the time this occurred, December 17,
7  2017, how much was the overweight baggage fee?
8    A.    I don't know.
9    Q.    Was it under $100?
10    A.    I couldn't say.  I could guess that it's
11  $100 to $150, at a guess.
12    Q.    So in your mind it was a revenue issue as
13  to why termination was appropriate?
14    A.    Yes, sir.
15    Q.    Do you remember if Mr. Klekas conducted
16  his own investigation into what happened on December
17  17th?
18    A.    I believe his investigation is what the
19  people directly reporting to him are presenting.  So
20  statements and whatnot, I'm sure he did, read all the
21  statements and made his own --
22    Q.    Does Mr. Klekas work in Salt Lake City?
23    A.    No.  Not anymore.  He did.
24    Q.    Let me rephrase the question.  In December
25  of 2017 and January 2018, did Mr. Klekas work in Salt



Donald McLeish  *  April 29, 2021

 1  Lake City?

 2      A.    Oh, yes, sir.

 3      Q.    All right.  And to your knowledge did

 4  Mr. Klekas meet with Aline to get her side of the

 5  story?

 6      A.    I'm not aware.

 7      Q.    Did Mr. Klekas meet with Ms. Tonga to talk

 8  about what happened?

 9            MR. DIBBLE:  Objection.  Foundation.

10      A.    I don't know.  I do not know.

11      Q.    Did Mr. Klekas meet with Mr. Navarro about

12  the December 17 incident?

13            MR. DIBBLE:  Objection.  Foundation.

14      A.    I do not know.

15      Q.    Did Mr. Klekas meet with Ms. Alusa to talk

16  about the December 17 incident?

17            MR. DIBBLE:  Objection.  Foundation.

18      A.    I do not know.

19      Q.    Did Mr. Klekas speak with Mr. Abbott about

20  the December 17 incident?

21      A.    I don't know.

22            MR. DIBBLE:  Objection.  Foundation.

23      A.    Sorry.  I don't know.

24      Q.    Did Mr. Klekas tell you why he approved

25  your request?



1      A.    No.

2      Q.    Let's take a look at Exhibit 28.  It's

3  previously marked.  This would be what appears to be a

4  memorandum dated January 28th.  The date is January 28,

5  2017 but I believe that's a typo.  I believe the

6  correct date is 2018, but I'll ask you about that.  The

7  Bates number is Delta 66.  It's your name at the top

8  and it's from you.  Have you seen this document before

9  today?

10     A.    Yes, sir.

11     Q.    Did you write this document?

12     A.    I believe I did.

13     Q.    And the correct date would be January 28,

14 2018.  That's just a typo, right?

15     A.    Yes, sir.

16     Q.    Okay.  And did you send this memo to

17 Mr. Klekas at the same time you sent this e-mail we

18 just looked at in the previous exhibit?

19     A.    I couldn't say for certain.

20     Q.    Are there any reasons for the termination

21 recommendation that you made that are not listed in

22 this memo?

23     A.    No, sir.  Not that I'm aware.

24     Q.    Let's take a look at Exhibit 29.  It was

25 previously marked.  This would be a memorandum from



1  Kelley Nabors to Josh Jessup.  Subject line reads,

2  "Recommendation for termination."  The Bates number is

3  Delta 64.

4              Do you have that document before you?

5      A.    Yes, sir.

6      Q.    And it was your understanding that the

7  individuals who signed this document which appears to

8  be the general manager of human resources, was

9  identified as Josh Jessup, and the managing director of

10  human resources, do you recognize that signature?

11      A.    No.

12      Q.    Did you ever speak with Mr. Jessup about

13  what occurred on December 17?

14      A.    No, sir.

15      Q.    Did Mr. Jessup or Ms. Nabors travel to

16  Salt Lake City to conduct an investigation of the

17  December 17 incident?

18      A.    Not that I'm aware of.  I have no idea.

19      Q.    Do you know whether Ms. Nabors or

20  Mr. Jessup spoke with any of the other witnesses we've

21  talked about:  Mr. Abbott, Ms. Alusa, Ms. Tonga,

22  Mr. Navarro?

23      A.    Not that I'm aware of.  I have no idea.

24      Q.    In this memo Ms. Nabors states that Aline

25  falsified the weight of the bags to avoid being charged



1   the appropriate fees.  Do you agree or disagree with

2   that statement?

3       A.    I agree.

4       Q.    For the same reasons you've described,

5   correct?

6       A.    Yes, sir.

7       Q.    So Aline, at that point, had worked for

8   Delta for over twenty years, correct?

9       A.    Yes, sir.

10      Q.    And do you believe she would have

11  jeopardized her employment of over two decades to avoid

12  paying two overweight baggage fees?

13            MR. DIBBLE:  Objection.  Calls for

14  speculation.  Foundation.

15      A.    Can you ask it again?

16      Q.    Sure.  In fact, I'll rephrase.  Did it

17  make sense you to, was it logical you to, based on what

18  you knew about Aline, that she would jeopardize over

19  two decades of employment with Delta to avoid paying

20  two overweight baggage fees?

21      A.    No.

22      Q.    That didn't make sense to you, did it?

23      A.    It doesn't make sense, no.

24      Q.    And did that factor into your determination

25  of who was being a more credible witness about those



1   events?

2        A.    Yes.

3        Q.    Was that not reason to conclude that Aline

4   was being truthful and perhaps Ms. Alusa was not?

5        A.    At the end of the day when you read the

6   statements, no, it was not.

7        Q.    Let's take a look at a new exhibit,

8   Exhibit 48.

9              (EXHIBIT 48 WAS MARKED.)

10       Q.    To make sure we are looking at the same

11  document, this is a one-page exhibit.  The Bates number

12  is Delta 83.  It contains an e-mail from a Debbie

13  Dudek, D-U-D-E-K, sent on February 2 of 2018 to you,

14  Mr. Klekas, with a carbon copy to Ms. Nabors and

15  Mr. Jessup.  Subject line is, "Urgent action required,

16  Recommendation for Termination, Aline Finneman."  Are

17  we looking at the same document, sir?

18       A.    I believe we are, yes.

19       Q.    And in her e-mail Ms. Dudek states, "The

20  review of recommendation for termination of employment

21  for the referenced employee has been completed and the

22  Company has decided to terminate Aline Finneman's

23  employment."  End of quote.  Who is Ms. Dudek?

24       A.    I never met her, but I assume she is a

25  specialist in Atlanta, human resources.



1      Q.    Did you speak with Ms. Dudek about the
2  December 17 incident?

3      A.    No, sir.

4      Q.    To your knowledge did Ms. Dudek conduct
5  her own investigation into what occurred on December
6  17?

7      A.    I'm not aware.

8      Q.    To your knowledge was Ms. Dudek required
9  to approve the termination decision?

10      A.    I would not know that.

11      Q.    So just to be clear, the termination
12  decision had to clear two layers of approval.  One
13  layer would be Mr. Klekas, and then the other layer
14  would be human resources, correct?

15      A.    I don't know how many -- I don't know how
16  many hands -- I don't know how many layers.  I mean,
17  certainly the boss between myself and Tony Klekas is
18  Marc Stetler, so he would be involved as well.  I don't
19  know before that, above Tony, and outside of Salt Lake
20  City I'm not sure exactly what the approval process is.
21  I knows it's HR.

22      Q.    Okay.  Did Mr. Stetler ever tell you that
23  he thought that Delta should terminate Aline's
24  employment based on the December 17 incident?

25      A.    Mr. Stetler was involved with the decision.



Donald McLeish  *  April 29, 2021                                                    88

1        Q.    My question is a little bit different.

2        A.    Okay.

3        Q.    Did Mr. Stetler ever tell you specifically

4    that he thought that Delta should terminate Aline's

5    employment based on what happened on December 17th?

6        A.    Boy, I don't remember a specific

7    conversation, but I would say yes.

8        Q.    Do you recall when he said that?

9        A.    I don't recall a conversation.

10       Q.    Who was it that notified Aline that her

11   employment had been terminated?

12       A.    It may have been Marc.  I can't remember

13   if the final conversations were with me or not.

14       Q.    When was the last time you spoke with

15   Ms. Finneman?

16       A.    Outside of a funeral service that we both

17   attended, prior to that it would have been a date,

18   whatever this document shows.

19       Q.    Let me rephrase.  According to Exhibit 21,

20   and I believe we talked a bit about your conversation

21   with Finneman on January 24, 2018.

22       A.    Yeah.

23       Q.    January 24, that conversation where you

24   notified her of the suspension, was that the last time

25   you spoke with her before her employment was terminated



1  by Delta?

2       A.     I believe so.

3       Q.     All right.

4       A.     To the best of my knowledge, yes.

5       Q.     And why didn't you notify Aline that her

6  employment had been terminated?  Why was it done by

7  Mr. Stetler?

8       A.     I think I was on days off or something.

9  It had to do with people's time off and schedules.

10      Q.     All right.  And then you mentioned that

11  you've spoken with Aline since the termination,

12  correct?

13      A.     It was in passing, brief, at a funeral

14  service.

15      Q.     When was that?

16      A.     Boy, I don't know.  I couldn't tell you

17  for certain.

18      Q.     And I don't necessarily need to know the

19  person's name who died, but can you tell me briefly who

20  they were, who was the funeral for?

21      A.     A bag room employee both of us had worked

22  with for a long time.

23      Q.     How long did you speak with Ms. Finneman

24  on that date?

25      A.     Seconds.  It was a, "How are you?"



1      Q.    Did it go beyond, "How are you?"

2      A.    I don't believe so, no.

3      Q.    Have you spoken with her on any other

4  occasion since the termination?

5      A.    No, sir.

6      Q.    Is it your understanding that in your new

7  employment with AtAirPros that you will be working

8  alongside Ms. Finneman?

9      A.    I recently discovered that.

10     Q.    Are you aware that Ms. Finneman applied

11 for Delta's administrative OSM position in September of

12 2017?

13     A.    I am, yes.

14     Q.    And Delta ultimately selected Todd Monette

15 for that position, correct?

16     A.    Yes, sir.

17     Q.    Were you involved in the decision to

18 select Mr. Monette for the position?

19     A.    I believe so.

20     Q.    And why did you believe that Mr. Monette

21 was the better choice than Ms. Finneman?

22     A.    Mr. Monette's only -- a big deciding

23 factor would be Mr. Monette's experience as a station

24 manager gave him experience building schedules, working

25 with finance, and creating shift bids, which is really



1   what that administrative position does.

2        Q.    But you concluded that Mr. Monette was the

3   better selection because of his experience as a station

4   manager?

5        A.    Yes, sir.

6        Q.    What were the job duties of the

7   administrative OSM position?

8        A.    Building shift bids, helping support the

9   station's finances, and administrative computer work.

10       Q.    What are shift bids?

11       A.    Employees shift, so schedule changes and

12   shift changes every six months.  People bid on their

13   new day off pattern and their new work area.

14       Q.    Who else was involved in the decision to

15   select Mr. Monette for the position?

16       A.    It would have been department managers and

17   general managers.  It would have been the group.

18   There's certainly a significant amount of weight put on

19   the score, the stars interview process, but background

20   considered, as well.  And it would be a conversation

21   that we would review interview scores and have dialogue

22   with local leaders.  But that position --

23       Q.    Mr. Stetler was also involved, was he not?

24       A.    Absolutely.  Marc Stetler, and I'm sure

25   Tony Klekas, Kelley Nabors, Keith Stowe.



1    Q.    Did you interview Ms. Finneman for the

2    administrative OSM position?

3    A.    I don't recall.

4    Q.    Do you recall who was interviewed for that

5    position?

6    A.    Who else was interviewed?

7    Q.    Right.  Presumably Mr. Monette was

8    interviewed, right?

9    A.    Yes.

10    Q.    Who else was interviewed?

11    A.    I do not know.

12    Q.    Do you know how many interviews there

13    were?

14    A.    I don't know.

15    Q.    In your time as a department manager, have

16    you ever permitted any of your OSMs to chew tobacco

17    while they were on duty?

18    A.    No.

19    Q.    And in your time as a department manager,

20    have you ever used Delta flight benefits to fly to

21    other states to purchase vehicles?

22    A.    Yes.

23    Q.    On how many occasions?

24    A.    Four.  Maybe five.

25    Q.    And you would fly to another state,



1  purchase a vehicle, and then drive the vehicle back to

2  Salt Lake City?

3        A.    Yes, sir.

4        Q.    Okay.  Do you know whether that's a

5  violation of Delta's nonrevenue flight policy?

6        A.    I know that it's not a violation.

7        Q.    Are you familiar with a Delta employee

8  named Leonard or Len Frig, F-R-I-G?

9        A.    Yes.

10       Q.    What was his job title?

11       A.    He was an OSM on the ramp.

12       Q.    And did you ever terminate Mr. Frig's

13  employment or recommend termination?

14       A.    Boy, I have no recollection of the details

15  surrounding it, if I was involved.

16       Q.    Were you aware of any allegations that

17  Mr. Frig had violated Delta's policy on harassment?

18       A.    No recollection at this time.

19       Q.    Are you familiar with Delta employee or

20  former employee Lanette Smith?

21       A.    Yes.

22       Q.    And did she work under your supervision?

23       A.    I believe she did, when I was passenger

24  service manager.

25             MR. DIBBLE:  Austin, we are going to



CITICOURT
THE REPORTING GROUP

 1   designate this portion of the deposition as

 2   confidential.

 3              MR. EGAN:  That's fine.

 4        Q.    (By Mr. Egan)  Is it true that Ms. Smith

 5   also manipulated baggage scales to avoid paying over-

 6   weight baggage fees?

 7        A.    No knowledge of such thing occurring.

 8        Q.    Do you know whether Delta terminated

 9   Ms. Smith's employment?

10        A.    I do not know.

11        Q.    Are you familiar with Delta employee or

12   former employee Eric Smitkoff, S-M-I-T-K-O-F-F?

13        A.    I know Eric Smitkoff, yes.

14        Q.    Did Delta terminate his employment?

15        A.    I'm not aware.

16        Q.    What was his job title?

17        A.    I believe he was a front line CSA.  I'm

18   not sure if he was a redcoat.  I think he might have

19   been a redcoat.

20        Q.    Do you know whether Mr. Smitkoff waived

21   overweight baggage fees for himself on any occasion?

22        A.    No knowledge of any such thing.

23        Q.    Are you familiar with employee Michelle

24   Carr, with two Rs?

25        A.    Yes.



1      Q.    What was her job title?

2      A.    Frontline employee, CSA.

3      Q.    And do you know whether Ms. Carr ever

4  waived overweight baggage fees for herself?

5      A.    Not to my knowledge.

6      Q.    Okay.  Those are all my questions about

7  comparators.  I think we can remove the confidential

8  designation there.

9           MR. DIBBLE:  Okay.

10           MR. EGAN:  I'm showing 10:46.  Why don't

11  we take one more five-minute break and then I think I

12  have no further questions, but let me review my notes.

13  Would that be okay?

14           MR. DIBBLE:  That would be great.

15           MR. EGAN:  See you in five minutes.

16           (Break taken from 10:46 to 10:59 a.m.)

17      Q.    (By Mr. Egan)  Mr. McLeish, do you

18  understand that you are still under oath?

19      A.    Yes, sir.

20      Q.    Did you ultimately conclude that Aline's

21  bag weights that she entered on December 17 of 50

22  pounds and 50 pounds, did you conclude that that had

23  jeopardized the safety of the flight she boarded to

24  Portland?

25      A.    It was not necessarily a safety concern.

