EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| ALINE FINNEMAN, | ) | Deposition of: |
| | ) | |
| Plaintiff, | ) | Marc Stetler |
| | ) | |
| vs. | ) | Civil No. |
| | ) | 2:19-CV-00327-HCN-CMR |
| DELTA AIRLINES, INC., | ) | |
| a Delaware Corporation, | ) | Judge Howard C. Nielson, Jr. |
| | ) | |
| Defendant. | ) | Magistrate Cecilia M. Romero |

VIRTUAL DEPOSITION VIA ZOOM

April 29, 2021 * 1:00 p.m.

Witness Location:  Salt Lake City, Utah

Reporter:  Diana Kent, RPR, CRR
Notary Public in and for the State of Utah

1                    P R O C E E D I N G S

2

3                      Marc Stetler,

4        called as a witness, being first duly sworn,

5            was examined and testified as follows:

6

7                       EXAMINATION

8  BY MR. EGAN:

9        Q.    Good afternoon.

10        A.    Afternoon.

11        Q.    My name is Austin Egan.  I'm an attorney

12  representing Aline Finneman in her lawsuit brought

13  against Delta Airlines.

14            Will you please state your full name and

15  spell it out, please.

16        A.    Marc Stetler, M-A-R-C, S-T-E-T-L-E-R.

17        Q.    All right.  Have you ever had your

18  deposition taken before?

19        A.    No.

20        Q.    A few ground rules, just because our

21  conversation is being transcribed today.  Let's do our

22  very best to see if we can avoid what's called cross-

23  talk, where we are both talking at the same time.  I

24  will do my very best to wait for you to finish

25  answering my question before asking a new one, and if



1  you could do your very best to wait to answer my

2  question until I'm done asking it, that will give us a

3  clearer record when we get the transcript.

4          Please try and answer the questions with

5  an audible yes or no as opposed to a shaking or nodding

6  of the head or some variation thereof.  If you don't

7  understand a question, just tell me.  I'm happy to

8  repeat or rephrase it.  And if you answer the question,

9  I will assume you understood it.  Does that make sense?

10     A.    Yes.

11     Q.    If you need a break today, just tell your

12  counsel or tell me you need a break.  The only rule

13  about breaks is that if there is a question pending,

14  you'll need to answer that question before we take a

15  break.  And do you understand that you have been placed

16  under oath today?

17     A.    Yes.

18     Q.    And do you understand that you have an

19  obligation to testify truthfully just as if we were in

20  a court of law?

21     A.    Yes.

22     Q.    Are you under the influence of any

23  medications or any substances that might impair your

24  ability to testify today?

25     A.    No.



1        Q.     If I say "Delta" today I'm referring to

2   Delta Airlines, the defendant in this lawsuit.  Does

3   that make sense to you?

4        A.     Yes.

5        Q.     Are you currently employed?

6        A.     Yes.

7        Q.     Where are you employed?

8        A.     Delta Airlines.

9        Q.     And what is your current job title?

10       A.     General manager.

11       Q.     Do you work out of the Salt Lake City

12   airport?

13       A.     Yes.

14       Q.     Who is your direct supervisor?

15       A.     Adam Ryan.

16       Q.     What is Mr. Ryan's title?

17       A.     Managing director.

18       Q.     How would you summarize your duties as

19   general manager?

20       A.     Oversight of Delta's ramp operations at

21   SLC.

22       Q.     How long have you been in the role of

23   general manager?

24       A.     One and a half years.

25       Q.     So what was your job title before you



1   became GM?

2        A.    Department manager.

3        Q.    And would that be a department manager for

4   what I've been told is the below-wing part of Delta's

5   operations in Salt Lake?

6        A.    Yes.

7        Q.    How long were you in that role?

8        A.    Two and a half years.

9        Q.    So from, say, mid 2017 to around sometime

10  in 2020?  Would that sound right to you?

11       A.    That sounds about right.  Possibly a

12  little bit earlier.

13       Q.    Okay.  And how would you describe or

14  summarize your duties as department manager below-wing?

15       A.    Oversight of aircraft loading and

16  unloading at SLC.

17       Q.    Loading and unloading meaning baggage?

18       A.    Yes.

19       Q.    And maybe food to serve the passengers?

20  Is that included in your role?

21       A.    No.

22       Q.    Okay.  While you were department manager,

23  who was your direct supervisor?

24       A.    I had two -- I had two direct supervisors.

25  At one time, the beginning of my tenure as department



1  manager, was Tony Klekas; and the second half of my

2  time as department manager it was Daniel Ketchel.

3       Q.    Can you spell the last name?

4       A.    For which general manager?

5       Q.    Ketchel.

6       A.    K-A-T-C-H-E-L [sic].

7       Q.    And then during your time as department

8  manager, Mr. Stowe was the department manager for the

9  above-wing division; would that be accurate?

10      A.    Yes.

11      Q.    And Mr. McLeish was another department

12 manager for below-wing at the same time you were,

13 correct?

14      A.    Yes.

15      Q.    Was Mr. McLeish your supervisor or were

16 you his supervisor or were you peers?

17      A.    We were peers.

18      Q.    And the time that you worked as department

19 manager, you had an office at the Salt Lake airport,

20 right?

21      A.    Yes.

22      Q.    And you are aware of who Aline Finneman

23 is, correct?

24      A.    Yes.

25      Q.    You have met her on several occasions,



1  correct?

2       A.    Yes.

3       Q.    And she previously worked for Delta,

4  correct?

5       A.    Yes.

6       Q.    And she started working in Salt Lake City

7  as an OSM, or operations service manager, in 2016,

8  correct?

9       A.    I'm not sure when Aline became an OSM.

10       Q.    All right.  Was it your understanding that

11  Aline had transferred to Salt Lake City from Texas?

12       A.    I don't have that understanding.

13       Q.    Were you involved in any decision making

14  that brought Aline from Texas to Salt Lake City?

15       A.    No.

16       Q.    And you were not Aline's direct supervisor;

17  that would have been Mr. McLeish, right?

18       A.    Correct.

19       Q.    During the time period that Ms. Finneman

20  was in Salt Lake City working for Delta, which I would

21  represent to you was 2016 until her termination on or

22  about February 3, 2018, who are the OSMs that you

23  supervised?

24       A.    That was a large group of individuals.  I

25  don't have a full roster here before me.  Would you



1   like me to -- go ahead.

2       Q.   Without speculating, and just your best

3   estimation, how many OSMs would you estimate that you

4   supervised in that time period?

5       A.   Twelve at a time.

6       Q.   And in total, would that be more than

7   fifty, fewer than fifty?

8       A.   Fewer than fifty.

9       Q.   How often did you observe Ms. Finneman

10  performing her job duties?

11      A.   Two to three times a week.

12      Q.   And did Ms. Finneman or someone tell you

13  that she was originally from the Philippines?

14      A.   No.

15      Q.   Do you have an opinion of Ms. Finneman's

16  job performance?

17      A.   I perceived Ms. Finneman's job performance

18  to be strong.

19      Q.   Why would you say that?

20      A.   The team liked her, she was likable by our

21  employees, engaged with the daily operation, positive

22  demeanor.

23      Q.   Any other reasons?

24      A.   I think that summarizes it.

25      Q.   Were you ever involved in any performance



 1  reviews for Ms. Finneman, formal or informal?

 2       A.    Not that I recall.

 3       Q.    And were you involved in the decision to

 4  terminate Ms. Finneman's employment in 2018?

 5       A.    Not directly.

 6       Q.    Were you indirectly involved?

 7       A.    Yes.

 8       Q.    How so?

 9       A.    I was aware of the circumstances, and with

10  my prior customer service background was asked to

11  retrieve a full-length passenger name record for

12  Ms. Finneman's travel that was in question.

13       Q.    What was your understanding of the

14  circumstances that led to her termination?

15       A.    My understanding of the circumstances that

16  led to her termination were that she was running late

17  for a nonrevenue flight and processed her own check-in.

18  She assigned an inaccurate weight for the luggage she

19  was checking and circumvented excess baggage charges

20  that would have normally applied.

21       Q.    And what is your understanding based on?

22       A.    The passenger name record that I received,

23  that I retrieved, as well as video of the ticket

24  counter on the morning that she checked herself in.

25       Q.    And you would agree that the video you



1  observed does not include any audio?

2        A.    Correct.

3        Q.    What discussions did you have with

4  Mr. McLeish about the circumstances leading to

5  Ms. Finneman's termination?

6        A.    The circumstances about the details of her

7  check-in that morning.

8        Q.    And did you speak with Mr. McLeish about

9  this on multiple occasions or one occasion?

10        A.    Multiple occasions.

11        Q.    So if I were to represent to you that the

12  events leading to Ms. Finneman's termination occurred

13  on December 17, 2017, might that refresh your

14  recollection as to when your conversations with

15  Mr. McLeish occurred?

16        A.    My conversations would have been between

17  the date you just provided and her termination.

18        Q.    And how many times would you estimate that

19  you spoke to Mr. McLeish; more than five, fewer than

20  five?

21        A.    I would put it at about five.

22        Q.    At about five.  Fair enough.  Have you

23  spoken with anyone at Delta's Human Resources

24  Department about the recommendation for termination of

25  Ms. Finneman's employment?



1      A.     I don't recall.

2      Q.     How about Kelley Nabors?

3      A.     I know Kelley Nabors.

4      Q.     Did you speak with her about the

5  recommendation for termination of Ms. Finneman's

6  employment?

7      A.     I don't recall.

8      Q.     How about Mr. Jessup?

9      A.     No.

10     Q.     Let's take a look at what was previously

11 marked as Exhibit Number 20.

12     A.     Okay.

13     Q.     This looks like an e-mail from you dated

14 January 20, 2018 to Kelley Nabors and Don McLeish with

15 a carbon copy to Mr. Klekas and Mr. Stowe and

16 Mr. Ketchel.  Did you send this e-mail?

17     A.     Yes.

18     Q.     Did someone ask you to send this e-mail?

19     A.     As I stated previously, I was asked to

20 retrieve the past-dated record, which this is, to

21 assist with the investigation that Donald was leading.

22     Q.     So did Mr. McLeish ask you to obtain this

23 information?

24     A.     No.  I volunteered to retrieve this

25 information.



1      Q.    All right.  Can you help me interpret some

2  of this data?  It looks like some of the information is

3  about Niki Alusa's sine and then some of the data

4  appears above Ms. Finneman's sine.  Would you agree?

5      A.    Yes.

6      Q.    Could you identify what Ms. Finneman's

7  sine is?

8      A.    Ms. Finneman's sine is MC, which is also

9  known as employee number 012178.

10     Q.    And could you identify Ms. Alusa's sine?

11     A.    Yes.  Ms. Alusa's sine is numerical 16,

12 synonymous employee number 850917.

13     Q.    Let's start with the information about Ms.

14 Alusa's sine.  Can you help me interpret what that

15 means?

16     A.    Yes.  The acronym AB is for adding a bag

17 and then it lists "bag," and the flight number, date,

18 destination, and Delta tag number, slash, the weight of

19 the bag.  So the first line indicates a 35-pound bag.

20     Q.    And then would that be the same for the

21 information above Ms. Finneman's sine?

22     A.    Yes.  Similar information.  There's a

23 difference in the tag number and the weight.

24     Q.    So what this is showing us is Ms. Alusa

25 checked in two bags, one weighing 35 pounds, another


CITICOURT
THE REPORTING GROUP

1  weighing 45 pounds, both bags destined to Portland from

2  Salt Lake.  Would you agree?

3      A.    Yes.  And then on to Narita and Manila,

4  yes.

5      Q.    And then if we look at the information

6  about Ms. Finneman's sine, we have a bag going from

7  Salt Lake City to PDX, which is Portland, right?

8      A.    Yes.

9      Q.    And it shows a weight of 50 pounds and

10 then another bag also showing a weight of 50 pounds

11 according to this report, right?

12     A.    That's my understanding, yes.

13     Q.    How did you obtain this information?

14     A.    Through our global assistance center.

15     Q.    Is this information you ever shared with

16 Ms. Finneman?

17     A.    No.

18     Q.    Did you discuss this report with

19 Mr. McLeish?

20     A.    By way of this e-mail, it looks like I

21 provided that to Mr. McLeish and Kelley Nabors.

22     Q.    Did you have any oral discussions with

23 Mr. McLeish about this report?

24     A.    I don't know.

25     Q.    Let's take a look at Exhibit 51.  Excuse



 1  me.  Exhibit 50.

 2              MR. DIBBLE:  Sorry.  Which one, Austin?

 3       Q.    All right, Mr. Stetler, we have handed you

 4  a deposition, Exhibit Number 50.

 5              (EXHIBIT 50 WAS MARKED.)

 6       Q.    At the bottom half of the page it looks

 7  like it's an e-mail from you dated April 4, 2017 to a

 8  Nikki Eberhardt and a few other parties.  Do you see

 9  that?

10       A.    Yes.

11       Q.    Is that an e-mail you sent?

12       A.    Yes.

13       Q.    Who is Nikki Eberhardt?

14       A.    Our communications coordinator.

15       Q.    Who is the other individual you sent this

16  to, Bret Larson?

17       A.    He is a leader at Delta and I'm trying to

18  remember at the time that this was sent what his role

19  was.  I'm not positive.

20       Q.    In your e-mail you refer to pasting a

21  photo of a check presentation, at least that's what you

22  refer to it as, and you state, "My only other feedback

23  is around the FIT announcement, can we please include

24  Aline Finneman and Shane Mack?"  Do you see that?

25       A.    Yes.



1        Q.      What were you discussing there?

2        A.      Well, FIT is our Frontline Involvement

3    Team, and we had OSMs support FIT which, in this case,

4    would have been Aline and Shane.  So it appears that I

5    was working with our communications coordinator to

6    make -- on a FIT announcement in sharing some of the

7    good things that were happening in the community.

8        Q.      And why did you want to include

9    Ms. Finneman and Mr. Mack?

10       A.      Because they oversee FIT.

11       Q.      Let's take a look at Exhibit 51.

12              (EXHIBIT 51 WAS MARKED.)

13       Q.      Mr. Stetler, I hope you've been handed

14   Exhibit 51.  This will be a new exhibit, and it's a

15   single page with an e-mail from a Taniela Pahulu, I

16   hope I'm saying that correctly, to you dated September

17   21, 2017.  And then the e-mail in the upper half of the

18   page appears to be your response to Ms. Pahulu the

19   following day, September 22, 2017.  Have you seen these

20   e-mails before today?

21       A.      Yes.

22       Q.      Who is Taniela Pahulu?

23       A.      A ramp employee.

24       Q.      Do you recall her job title?

25       A.      No.  I'm sorry.



1        Q.    In her e-mail, Ms. Pahulu thanked you for
2   meeting with her.  She refers to some issues and
3   concerns and complaints and having to deal with OSM
4   Aline Finneman.  Do you see that?
5        A.    Can I take a minute to read this section?
6        Q.    By all means.
7        A.    Okay.  I've read the note from Taniela to
8   me.
9        Q.    Okay.  And what was your understanding of
10  the issues, concerns, and complaints and having to deal
11  with Ms. Finneman?  What was your understanding of
12  that?
13       A.    My understanding of that was consistency
14  relative to her peers, and how she felt Aline treated
15  her.
16       Q.    Let's start with consistency.  What were
17  her concerns with consistency?
18       A.    This is quite a ways back.  I don't
19  remember the consistency complaints to great detail,
20  but --
21       Q.    Well, later in her e-mail -- and if you
22  don't remember, that's fine.  No one's memory is
23  perfect.
24       A.    Okay.
25       Q.    If you don't remember, just tell me you



```
 1  don't remember.
 2       A.    Okay.
 3       Q.    Later in the e-mail Ms. Pahulu refers to
 4  undertones of racial discrimination of Pacific
 5  Islanders of Tongan descent.  Do you see that?
 6       A.    I do.
 7       Q.    Did you have any discussions with her
 8  about that allegation?
 9       A.    Yes.  I met with her to understand those
10  concerns.
11       Q.    Do you recall what she told you?
12       A.    I don't.
13       Q.    Did she specifically mention Mr. McLeish?
14       A.    I don't remember.
15       Q.    Do you recall what she was referring to
16  when she said "having to deal with" Ms. Finneman?
17       A.    I don't.  I'm sorry.
18       Q.    Did any -- in the time that you were the
19  department manager below wing, did anyone tell you that
20  they believed that Mr. McLeish had undertones of racial
21  discrimination directed to Pacific Islanders?
22       A.    No.
23       Q.    Did anyone tell you that Mr. McLeish --
24  did you hear any allegations of Mr. McLeish having
25  discriminatory intent directed at Asians?
```



1        A.    No.

2        Q.    Did anyone tell you that they had concerns

3   that Mr. McLeish had discriminatory intent directed at

4   females?

5        A.    No.

6        Q.    And Ms. Pahulu refers to what she calls

7   unfairness, preferential treatment, hostile work

8   environment, and prejudice.  Did you understand -- or

9   what was your understanding of what she was referring

10  to?

11       A.    I don't remember the nature of her

12  complaint and what drove her to feel that way.

13       Q.    All right.  Let's take a look at Exhibit

14  52.  Another new exhibit.

15             (EXHIBIT 52 WAS MARKED.)

16       Q.    Take a moment to look it over,

17  Mr. Stetler, and then I'd like to ask you a few

18  questions about it.  Okay?

19       A.    Okay.

20             Okay.  I've reviewed that.  It looks like

21  there's some content missing, so I suppose we are just

22  talking about these two pages?

23       Q.    Well, let's start with the first page.

24  There's an e-mail from you dated August 29, 2017 and

25  it's directed to Mr. Klekas, Mr. McLeish, it looks

```
 1   like -- I'm sorry, from Mr. Stowe, my mistake, to

 2   Mr. Klekas, Mr. McLeish, to you, and Kelley Nabors, and

 3   the subject line referring to The Best in the West.  Do

 4   you see that?

 5        A.    Yes, I do.

 6        Q.    What is The Best in the West?

 7        A.    It was a recognition program at the time.

 8        Q.    Recognition program of what?  Performance?

 9   High performance?  Achievement?

10        A.    Yes.  Excellent performance.

11        Q.    All right.  And on the right side of

12   Mr. Stowe's e-mail he refers to OSMs and includes

13   several individuals, including Ms. Finneman.  Do you

14   see that?

15        A.    Yes, I do.

16        Q.    And in his e-mail Mr. Stowe refers to,

17   "Hopefully you've had a chance to review and offer

18   suggestions," and he states, "These are my

19   recommendations."  So is it your understanding that

20   Mr. Stowe was recommending several individuals for Best

21   in the West, including Ms. Finneman?

22        A.    Yes.  My recollection is he was compiling

23   the nominees and providing this recommendation.

24        Q.    Did Mr. Stowe tell you specifically why he

25   had nominated Ms. Finneman or recommended Ms. Finneman?
```



1        A.     No.

2        Q.     And then in your response, which appears

3    above it, August 29, 2:41 p.m. you state, "Keith, looks

4    good to me.  Thanks for all you've done on this, Marc."

5    Do you see that?

6        A.     Yes.

7        Q.     Did you agree with Marc's recommendations

8    that they were accurate?

9        A.     I agreed with Keith's recommendations that

10   these were balanced nominations, and supported it.

11       Q.     Excellent.  Thank you.  Keith's

12   recommendations.  Thank you.

13       A.     Yes.

14       Q.     Let's take a look at Exhibit 53.  This

15   will be a one-page memorandum.  Please review it and

16   let me know when you are ready to answer a few

17   questions about it.

18              (EXHIBIT 53 WAS MARKED.)

19       A.     Okay.  I've read it.

20       Q.     Did you write this memo?

21       A.     I don't remember.  I remember memos at the

22   time usually went through a few -- it was kind of a

23   shared process.  So I likely had a hand in this, with

24   others able to provide edits.

25       Q.     And who were those others you refer to?



1        A.     My peers, Don McLeish and Keith Stowe.

2        Q.     And so based on this memorandum is it

3   correct to say that as of September 18, 2017, Delta was

4   considering a new person to fill the administrative OSM

5   position previously occupied by Bret Larson?

6        A.     Yes.

7        Q.     And why was Bret Larson being moved out of

8   that position?

9        A.     He had been in the position a bit of time,

10  and this is a position we have historically rotated.

11       Q.     And why is it that Delta has rotated that

12  position?

13       A.     For fresh perspective in the role,

14  opportunities for our OSMs to get experience in some

15  other areas.

16       Q.     All right.  What were the duties and

17  responsibilities of the administrative OSM position

18  discussed in this memo?

19       A.     Shift bid creation, payroll and scheduling

20  oversight, station financing and billing, station event

21  planning would be the main roles for this.

22       Q.     And would the person filling that

23  administrative OSM position report directly to you?

24       A.     No.

25       Q.     Who would they report to?



CITICOURT
THE REPORTING GROUP

1       A.    Don McLeish.

2       Q.    And were you involved in the process of

3   selecting an employee to fill that position?

4       A.    Yes.

5       Q.    Was anyone else involved?

6       A.    Yes.

7       Q.    Who else?

8       A.    Don McLeish, and Keith Stowe.

9       Q.    And did Delta interview any applicants for

10  that position?

11      A.    We met with four applicants for this

12  position.

13      Q.    Do you recall who they were?

14      A.    Aline Finneman, David Proctor, Todd

15  Monette, and I'm sorry, the fourth name is escaping me.

16      Q.    All right.  Do you recall who interviewed

17  Ms. Finneman for the position?

18      A.    I don't.

19      Q.    Do you know when the interview took place?

20      A.    No.

21      Q.    Did you speak to Mr. McLeish or Mr. Stowe

22  about the interview of Ms. Finneman?

23      A.    We spoke about the completed interviews to

24  discuss our recommendation.

25      Q.    Okay.  And ultimately Mr. Monette was



1  selected for the position, right?

2      A.    Right.

3      Q.    Do you know why?

4      A.    Mr. Monette had been a station manager

5  before, so somebody who had run his own airport, and

6  was responsible for all of the tasks that we were

7  looking at in this role.  Mr. Monette was performing

8  strongly in his role at the time and was a tenured

9  leader and we felt the best fit for the position for

10 the needs of the station.

11     Q.    All right.  Let's take a look at Exhibit

12 54.

13         (EXHIBIT 54 WAS MARKED.)

14     A.    Okay.

15     Q.    It's a two-page exhibit.  And when you

16 look at e-mail threads that are printed out, the oldest

17 e-mail usually appears last with the newest e-mail

18 appearing first.  Let's take a look at your e-mail that

19 starts at the bottom of page 1, carrying over to page

20 2.

21     A.    Okay.

22     Q.    And if you'd like to take a minute and

23 review it, by all means do so.

24     A.    Okay.  I've read it.

25     Q.    So this is an e-mail that you sent



1   announcing essentially a heads-up about an upcoming

2   announcement for the administrative OSM position.  And

3   then you, in your next e-mail dated September 19, refer

4   to you failed to set a deadline and, "Please let Keith,

5   Don, or me know of your interest by Friday, September

6   22."  And then your e-mail on September 23 is what I'd

7   like to ask you about.

8        A.    Okay.

9        Q.    And it looks like you referred to those

10  who had shown interest.  And that would be interest in

11  the administrative OSM position, right?

12       A.    Yes.

13       Q.    And you referred to three employees who

14  work above wing and three employees below wing, right?

15       A.    Yes.

16       Q.    And might that refresh your recollection

17  as to the fourth individual interview?

18       A.    Yes.  Thank you.  That would be Scott Fry.

19       Q.    Why did you believe -- or did you believe

20  that Mr. Monette was a more qualified or better

21  selection for the administrative OSM position than

22  Ms. Finneman?

23       A.    Todd had been a leader for a longer time,

24  had led in multiple locations, and, as I stated

25  previously, had led an airport where the job



 1   requirements were things he did on a smaller scale that
 2   we thought could be scaled for best support of the Salt
 3   Lake City operation.
 4          Q.    Did your considerations or Mr. McLeish's
 5   considerations for this position, did that have
 6   anything to do with the fact that Ms. Finneman was
 7   female?
 8          A.    Can you rephrase the question?
 9          Q.    Sure.  In your consideration of filling
10   the administrative OSM position and in making your
11   decision, was it relevant to you that Ms. Finneman was
12   female?
13          A.    Yes.
14          Q.    How so?
15          A.    We look for diversity when we make hiring
16   decisions.  That's something that we do.
17          Q.    I'm sorry to interrupt.  Go right ahead.
18          A.    I was closing by saying that's something
19   we consider.
20          Q.    Okay.  Was it also relevant in your
21   consideration that Ms. Finneman had brown skin and she
22   is originally Asian?
23          A.    Yes.  Our consideration included that
24   Aline was a female and a minority.
25          Q.    Okay.  And yet she was not selected and



1   instead the selection was Mr. Monette, a white male,

2   correct?

3        A.   Yes.

4        Q.   There's some handwriting next to those who

5   had shown interest.  It looks like dates and then "no

6   STM" or "STM."  Is that your handwriting?

7        A.   No.

8        Q.   Do you know whose handwriting it is?

9        A.   I don't.

10       Q.   Do you have any understanding of what that

11  handwriting is referring to?

12       A.   That handwriting is referring to hire

13  dates and station manager experience, yes or no.

14       Q.   So whoever wrote that, those comments,

15  according to the author, five of the applicants had no

16  STM experience, and Mr. Monette did.  Would you agree?

17       A.   Correct.

18       Q.   Okay.  What position was Mr. Monette

19  working in before he filled the administrative OSM

20  position?

21       A.   He was an operation service manager, just

22  like everybody else listed here.

23       Q.   In Salt Lake City?

24       A.   Yes.

25       Q.   Is it true that Mr. Monette resigned his



1  position as administrative OSM within a year of

2  starting it?

3      A.   I know that Todd rotated out of this role

4  at a later date.  I'm not sure exactly how long, and

5  another interested party was selected for the role, and

6  that person has subsequently rotated out of the role as

7  well.

8      Q.   When Mr. Monette left the position of

9  being an administrative OSM, was that his choice or

10  Delta's choice?

11      A.   That was a shared choice.

12      Q.   Meaning Delta and Mr. Monette decided that

13  he should part that role together?

14      A.   Yes.

15      Q.   Did he engage in any type of conduct that

16  led to that decision?

17      A.   No.

18      Q.   Were you involved in that decision?

19      A.   Yes.

20      Q.   How so?

21      A.   I was aware of the personal health

22  concerns that Todd's family was having that was

23  occupying quite a bit of his bandwidth.

24      Q.   So I don't want to know about Mr. Monette's

25  health conditions or health conditions of his family,



1   but would it be fair to say that one of the reasons he

2   left the position of being an administrative OSM is he

3   either had health conditions or his immediate family

4   had health conditions and he needed more of his time to

5   devote to caring for whoever was suffering.

6         A.    That's accurate.

7         Q.    Okay.  At the time you were considering

8   Mr. Monette for this position, what was your assessment

9   of his job performance as an OSM?

10        A.    Todd's performance was very strong as an

11  OSM.

12        Q.    Why would you say that?

13        A.    For the same reasons I described Aline's

14  performance was strong.  He was very engaged and

15  visible in the operation, had very strong people

16  relations, performed his collateral duties well, was

17  responsive when away from work.

18        Q.    Is there a particular reason that you did

19  not, you personally as opposed to Mr. Stowe or

20  Mr. McLeish, is there a particular reason why you did

21  not interview Ms. Finneman yourself for the position?

22              MR. DIBBLE:  Objection.  Mischaracterizes

23  testimony.

24              Go ahead.

25        A.    Can you restate the question?



1        Q.    Sure.  And I suppose I should back up one
2   step.  Is it true that you did not personally interview
3   Ms. Finneman for the administrative OSM position?
4        A.    I do not recall interviewing Ms. Finneman
5   for this position.
6        Q.    Okay.  Why not?
7        A.    The department leader that they report to
8   would have been responsible for having that discussion.
9        Q.    That would have been Mr. McLeish, right?
10       A.    Right.
11       Q.    Let's take a look at Exhibit 55.  Take a
12   moment to review it, Mr. Stetler, and then I'd like to
13   ask you about it.
14             (EXHIBIT 55 WAS MARKED.)
15       A.    Okay.  Okay, I've read it.
16       Q.    Did you write this memo?
17       A.    Likely.
18       Q.    And according to this memo dated October
19   12, Mr. Monette was going to fill the position of
20   administrative OSM effective November 1, 2017.  Do you
21   agree?
22       A.    Yes.
23       Q.    Did this result in an increase in his pay?
24       A.    No.
25       Q.    Do you know who this memo was sent to?



1      A.    This would have been sent first to our
2  leaders, OSMs and above, and then subsequently to our
3  frontline employees at SLC.
4      Q.    Let's take a look at Exhibit 56.  It's a
5  single-page exhibit.  Take a moment to review it to
6  yourself and then I'd like to ask you about it.
7            (EXHIBIT 56 WAS MARKED.)
8      A.    Okay.  Okay.  I've reviewed it.
9      Q.    All right.  There's an e-mail in the
10  middle of the page from you to Mr. Klekas dated October
11  10, 2017 referring to the administrative OSM memo, in
12  other words this was sent two days before the date of
13  that memo we just looked at in the prior exhibit.  And
14  you state, "I spoke with Aline tonight so I think we
15  have all our bases covered."  End of quote.  Do you see
16  that?
17      A.    Yes.
18      Q.    What were you referring to there?  What
19  bases were you hoping to cover and what did you speak
20  to Aline about?
21      A.    A notification of the outcome, so people
22  who expressed interest in a position don't hear about
23  it from a memo.  They are notified ahead of any formal
24  communication.  And it's necessary to make sure we've
25  had that discussion with anyone who expressed interest.



1        Q.     When you spoke with Aline that night, do
2   you recall how long the conversation was?
3        A.     No.
4        Q.     Do you recall any other details of the
5   conversation?
6        A.     I remember the location of the
7   conversation.
8        Q.     Where was that?
9        A.     My office.
10        Q.     How long did the meeting last?
11        A.     I would estimate fifteen minutes.
12        Q.     Was anyone else present?
13        A.     No.
14        Q.     Did you record the meeting?
15        A.     No.
16        Q.     Did Ms. Finneman ever tell you that she
17   felt like she was being discriminated against on the
18   basis of her sex?
19        A.     Never.
20        Q.     Did Ms. Finneman ever complain to you that
21   she felt like she was discriminated against on the
22   basis of her race or color?
23        A.     No.
24        Q.     Did Ms. Finneman ever tell you that she
25   was concerned that the Salt Lake City operations



```
 1   operated like a boys club?

 2        A.    No.

 3        Q.    Did Ms. Finneman ever tell you that she

 4   was passed over for the administrative OSM position on

 5   the basis of her sex, race, or color?

 6        A.    No.

 7        Q.    Did you agree with the recommendation made

 8   by Mr. McLeish to terminate Ms. Finneman's employment?

 9        A.    Yes.

10        Q.    Why?

11        A.    Because Ms. Finneman completed a terminable

12   offense.

13        Q.    Why was the offense terminable?

14        A.    Because she didn't conduct herself as we

15   would expect a Delta employee to do, and was dishonest

16   with her dealings with the company.

17        Q.    In what way was she dishonest?

18        A.    She circumvented our technology and

19   processes to under-assess fees that she should have

20   paid relative to the bags she checked on December 17th.

21        Q.    As of December 17, 2017, what was Delta's

22   fee for an overweight bag?

23        A.    I don't know.

24        Q.    Why not issue a written warning?  Why

25   proceed straight to termination?
```



1     A.    We don't tolerate dishonesty or theft from

2  Delta.

3     Q.    Do you consider this to be theft?

4     A.    Absolutely.

5     Q.    Why?

6     A.    Because the fees applied and should have

7  been rendered to Delta, and she took it in her own

8  hands to not collect those funds, and benefit herself.

9     Q.    So again, at the time, Ms. Finneman had

10  over twenty years of service with Delta.  Are you aware

11  of that?

12     A.    I'm aware she had about that much tenure

13  with Delta, yes.

14     Q.    Did you really think Ms. Finneman would

15  jeopardize two decades of her career to save some money

16  on overweight baggage fees?  Does that make sense to

17  you?

18     A.    I don't know why Aline made the decision

19  she did that day.  The information we got from the

20  investigation was pretty telling that she really had

21  some error in judgment in how she conducted herself on

22  December 17th.

23     Q.    Well, an error in judgment is one thing,

24  but you referred to theft, right?  Those are two

25  separate types of conduct, would you agree?

CITICOURT
THE REPORTING GROUP

1        A.    Not necessarily.

2        Q.    Okay.

3        A.    She made errors in judgment that led to

4   her -- that led to theft.  I guess that's what I or how

5   I would characterize that.

6        Q.    Well, this is behavior that she could have

7   corrected with a written warning, right?

8        A.    We don't typically correct dishonest

9   behavior and theft with written warnings.

10       Q.    Did you review written statements provided

11  by Niki Alusa and Cory Abbott?

12       A.    No.

13       Q.    Did you review any written statements

14  other than what we looked at here today in the

15  exhibits?

16       A.    No other written statements, no.

17       Q.    And have you told me everything that you

18  can recall about any oral discussions you had with

19  Mr. McLeish about the recommendation for termination of

20  Ms. Finneman?

21       A.    Yes.

22       Q.    Why don't we take a five-minute break.

23             (Break taken from 1:46 to 1:51 p.m.)

24       Q.    Mr. Stetler, do you understand that you

25  are still under oath?



1       A.      Yes.

2       Q.      Did you conduct any type of investigation

3    into Ms. Finneman's conduct that led to her termination

4    that you have not already described here today?

5       A.      No.

6       Q.      Okay.  Those are all my questions.  Thank

7    you for your time today.

8       A.      Thank you.

9               MR. DIBBLE:  I have no questions.  And the

10   witness reserves the right to review and sign.

11      Q.      All right.  Let's go off the record.

12              (The deposition concluded at 1:55 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

