Andrew W. Stavros (8615)
Austin B. Egan (13203)
**STAVROS LAW P.C.**
8915 South 700 East, Suite 202
Sandy, Utah 84070
Tel: 801.758.7604
andy@stavroslaw.com
austin@stavroslaw.com
*Attorneys for Aline Finneman*

---

## IN THE UNITED STATES DISTRICT COURT IN AND FOR
## THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALINE FINNEMAN, | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff, | |
| vs. | **Oral Argument Requested** |
| DELTA AIRLINES, INC., a Delaware Corporation, | Case No. 2:19-cv-00327-HCN-CMR |
| | Judge Howard C. Nielson, Jr. |
| Defendants. | Magistrate Judge Cecilia M. Romero |

Plaintiff Aline Finneman, by and through her counsel, and pursuant to DUCivR 56-1(c),

submits her memorandum in opposition to Defendant's motion for summary judgment.

i

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS ............................ 3

PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS ................................... 21

ARGUMENT ............................................................................................................... 27

   I.   Legal Standard for Summary Judgment .................................................... 27

   II.   Legal Standard for Title VII Employment Discrimination Claims .................................. 28

   III.   Finneman has Established a Prima Facie Case for Discrimination in Violation of Title VII ...................................................................................................29

      A.   Finneman's 22 Years of Excellent Service Preceding Her Summary Termination is Evidence of Discriminatory Intent ........................................................... 31

      B.   Delta's False Allegations Against Finneman is Evidence of Discriminatory Intent...... 32

      C.   McLeish's Flawed, Biased, and Incomplete Investigation is Evidence of Discriminatory Intent ........................................................................................ 33

      D.   McLeish's Preferential Treatment Directed to White Male Employees is Evidence of Discriminatory Intent ........................................................................... 34

      E.   McLeish's Sexist Comments and Complaints of Prejudice from Other Employees is Evidence of Discriminatory Intent .......................................................... 35

      F.   The Same Actor Inference Does Not Apply .................................................. 35

   IV.   Delta Retaliated Against Finneman in Violation of Title VII ....................................... 36

   V.   Delta's Proffered Reason for Termination is Pretextual.................................... 37

REQUEST FOR ORAL ARGUMENT ............................................................................. 39

CONCLUSION AND REQUEST FOR RELIEF ................................................................. 39

## **TABLE OF AUTHORITIES**

**Statutes**

42 U.S.C. § 2000e-2(a)(1)................................................................................... 28

42 U.S.C. § 2000e-3(a) ...................................................................................... 36

**Rules of Procedure and Evidence**

DUCivR 7-1(f) .................................................................................................... 38

Fed. R. Civ. P. 56(a) .......................................................................................... 27

Fed. R. Civ. P. 56(c)(2) ...................................................................................... 13

Fed. R. Evid. 801, 802 ....................................................................................... 13

**Cases**

*Advance Am. Cash Advance Ctrs., Inc. v. FDIC*, 2017 U.S. Dist. LEXIS 27887, *21, (D.D.C. Feb. 23, 2017) ................................................................................................... 13

*Alexander v. Casino Queen, Inc*., 739 F.3d 972, 979 (7th Cir. 2014) ........................................... 31

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) ..................................................... 28

*Antonio v. Sygma Network, Inc*., 458 F.3d 1177, 1183 (10th Cir. 2006)............................... 37, 38

*Conroy v. Vilsask*, 707 F.3d 1163, 1172 (10th Cir. 2013) .......................................... 40

*Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)............................................ 28, 30

*EEOC v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1193 (10th Cir. 2000)..................... 30

*EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007) .................................... 29, 35, 36, 39

*Elmore v. Capstan, Inc*., 58 F.3d 525, 530 (10th Cir. 1995) ........................................ 36

*Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008) ........................................ 33

*Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)................................ 30

*Harvey v. Anheuser-Busch, Inc*., 38 F.3d 968 (8th Cir.1994) ………………………………...30

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) ................... 32, 33

*McCleary v. Nat'l Cold Storage, Inc.*, 67 F. Supp. 2d 1288, 1293 (D. Kan. 1999) ..................... 34

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) .................................................... 28, 30

*McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) ................................................ 36

*McInerney v. United Air Lines, Inc.*, 463 Fed. Appx. 709, 716 (10th Cir. 2011) ........................ 30

*O'Shea v. Yellow Technology*, 185 F. 3d 1093 (10th Cir. 1999) .................................................. 28

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998) ........................................... 29

*Pinkerton v. Colo. Dept. of Transp.*, 563 F.3d 1052, 1063 (10th Cir. 2009) ......................... 38, 39

*Pittman v. American Airlines, Inc.*, 692 Fed.Appx. 549, 552 (10th Cir. 2017) ........................... 38
*Plotke v. White*, 405 F.3d 1092, 1102-03 (10th Cir. 2005) ....................................... 31, 38, 39, 40

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) ...................................... 30, 32

*Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999) ........................................ 29

*Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019) ............................................................ 29

*Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 541 (10th Cir. 2014) ................................... 36

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ............................................. 30

*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) .................................... 28

*Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007) ...................................... 40

*Trujillo v. PacifiCorp,* 524 F.3d 1149, 1159-60 (10th Cir. 2008) .................................. 32, 34, 35

*Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001 (10th Cir. 2011) ................................. 33

*U.S. Post. Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) ...................................... 30

*Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1200 (10th Cir. 2015) ................................ 31

## INTRODUCTION

The material facts of this case are disputed and Delta's motion should be denied.[1]

Ms. Finneman asserts claims against Delta for sex-based discrimination in violation of Title VII of the Civil Rights Act ("Title VII"), race/color-based discrimination in violation of Title VII, and retaliation in violation of Title VII.

Ms. Finneman is from the Philippines and she has brown skin. She provided Delta with over 22 years of outstanding and distinguished service. Her record of employment shows glowing performance reviews, multiple customer compliments, and performance accolades. After starting as a baggage agent for Delta in 1995, Finneman's exceptional job performance resulted in multiple promotions to the position of Operations Service Manager ("OSM") in Houston. However, after Ms. Finneman transferred to Salt Lake City in 2016 and began working under the supervision of Mr. McLeish, it became apparent that she was then working in what she referred to as a "boys club."

McLeish made misogynistic comments about Finneman's appearance and "smell," Finneman was passed over for a promotion, and she complained that she was subjected to discrimination because she is a female with brown skin. McLeish implemented two unequal standards for performance for employees under his supervision—a more preferential standard for white males, and a less preferential standard for females with brown skin. Finneman was not the only employee who felt this way, as another Delta employee in Salt Lake also complained about "prejudice" directed to Pacific Islanders.

On December 17, 2017, Finneman and her family were set to travel from Salt Lake to the

---

[1] As stated herein, "Finneman" refers to Plaintiff Aline Finneman, and "Delta" refers to Defendant Delta Airlines, Inc.

Philippines (with a connecting flight in Portland). With four travelers (Finneman, her husband, and two of her children), Finneman could have checked a total of eight bags (two bags per passenger). While at the ticket counter, Finneman and her two children presented four bags to be checked in. Ms. Alusa (Delta's ticket counter agent) told Finneman that two of those bags were over the 50-lb. limit (and subject to an overweight baggage fee). Alusa then told Finneman that she was calling another OSM to obtain a waiver of the overweight fee. Finneman responded that a waiver was unnecessary, and she instructed her two children to rearrange the bags so that all four of the bags fell under the 50-lb. limit. Finneman then left the ticket counter to finish a work task she had from the previous night (Finneman worked at the SL Int. Airport). While Finneman did not observe her children rearranging the bags, she reasonably believed they complied with her request.

Upon returning to the ticket counter, Finneman concluded that Alusa was not capable of checking in the bags, so she stepped behind the ticket counter and checked herself and her family in to the flight. Importantly, no Delta policy prohibited employees from checking themselves in, and other employees had checked themselves into flights. To be clear, Finneman did not request an overweight baggage waiver, and she did not process any waiver for herself. Again, she believed, reasonably, that her children rearranged the bags.

After receiving an allegedly "anonymous" complaint submitted to Delta's 1-800 "helpline," McLeish seized his opportunity to terminate Finneman's employment. McLeish commenced a deliberately flawed and biased investigation. He failed to notify Finneman she was under investigation, he withheld material information from Finneman, and he failed to interview relevant witnesses.

Delta's "Way We Fly" policy (the same policy Delta relies on to justify Finneman's termination) states that termination of employment involves a "rigorous process of review" and "usually" occurs only after the employee receives "prior coaching." McLeish bypassed this policy and summarily terminated Finneman's employment, without considering Finneman's 22 years of service.

Most importantly, the "waiver" allegations against Finneman are false, and falsity evidence is the hallmark of proving that an employer's proffered reasons for termination are pretextual. The core of this case presents conflicting testimony between the only two individuals who both saw and heard what took place at the ticket counter on December 17: Finneman and Alusa. Resolving this conflicting testimony involves a credibility assessment, and credibility assessments are not made in evaluating a motion for summary judgment. This conflicting testimony, along with multiple other material facts in dispute, preclude summary judgment, and Delta's motion should be denied.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS[2]

**Delta's SOF No. 1:** During her tenure at Delta, Plaintiff worked in different positions across Delta's "above wing" or customer-facing service department (Department 120) and Delta's "below wing" or baggage handling department (Department 125). Through her work in these various roles, she became intimately familiar with all the rules, regulations, processes, and policies surrounding customer check-in, bag fees and weights, and baggage handling. (See Deposition of Aline Finneman ("Finneman Dep.") at 26:21-27:18; 91:6-12; 95:13-21; 97:8-98:7;

---

[2] As stated herein, "SOF" refers to "Statement of Fact." Finneman's responses to Delta's SOF are for purposes of responding to Delta's motion for summary judgment only. Finneman's responses may be modified, amended, or supplemented for any other purpose. Where Finneman does not affirmatively dispute a factual assertion herein, that is not a concession that the asserted fact is relevant or material.

99:12-100:11; 122:5-123:22; 124:23-125:18; 158:2-7, the relevant pages of which are attached as Exhibit 1 to Appendix of Evidence).

**Finneman's Response:** Disputed. Department "120" refers to "below wing" operations (loading of bags), and department "125" refers to "above wing" (customer service) functions. (Delta's Ex. 1, Finneman Dep. at 27:8-24). Further, nowhere in the cited testimony did Finneman testify that she was "intimately familiar" with all the rules, regulations, processes, and policies listed. When she was asked about recording weights of the bags, Finneman testified, "We don't record weights of bag in service office." (Id. at 92:18-21).

**Delta's SOF No. 2:** In fact, Plaintiff helped train other employees on ticket-counter procedures. (Finneman Dep. at 99:12-24.)

**Finneman's Response:** Disputed. Delta mischaracterizes the deposition testimony. Finneman did not testify that she "trained" other employees on "ticket-counter procedures." She testified that she was previously "in charge of the ticket counter team," and that she made sure that their "trainings finish," and that their training materials and transcript were completed. (Delta's Ex. 1, Finneman Dep. at 99:14-21).

[Finneman does not dispute Delta's SOF Nos. 3-11]

**Delta's SOF No. 12:** In 2016, Plaintiff transferred back to Salt Lake City, where she continued to work as an OSM. (Finneman Dep. at 110:23-111:1.) Plaintiff was asked to return to Salt Lake City based on the input of several individuals, including Don McLeish, who interviewed Plaintiff for the position and subsequently served as her manager. (Finneman Dep. at 112:16-113:12; 114:18-20.)

**Finneman's Response:** Disputed. Delta mischaracterizes the deposition testimony.

4

Finneman testified that McLeish was "part" of the decision to hire her as an OSM in Salt Lake, but the decision was also made by Timothy Stout (Delta's acting interim Director in Salt Lake), Michele Carson-Vaughn, and Keith Stowe. (Delta's Ex. 1, Finneman Dep. at 112:16-25, 114:19-22). Mr. Stout appeared to be the catalyst of getting Finneman to transfer from Houston to Salt Lake. Mr. Stout asked Finneman if she could be part of the "change" in Salt Lake City "as far as diversity is concerned in the leadership group." Stout asked Finneman if she would be interested in "putting in for a position in Salt Lake City." (Id. at 111:24-25, 112:1-9).

When Finneman transferred from Houston to Salt Lake, McLeish testified that Delta's "leadership team" conducted interviews. While McLeish said he was "supportive" of Finneman transferring to Salt Lake, he was not sure that he was the one who interviewed Finneman. (Ex. 2, McLeish Dep. at 17:13-25. 18:6-12).

[Finneman does not dispute Delta's SOF No. 13]

[In response to Delta's SOF No. 14, Finneman admits that Delta has accurately cited its "equal opportunity employer" policy, but the language of that policy, and nothing more, does not prove that Delta has complied with the policy.]

[Finneman does not dispute Delta's SOF Nos. 15-18]

**Delta's SOF No. 19:** Similarly, to ensure the safety of travelers, the FAA has placed limits on how much an aircraft (including bags) may weigh and how such cargo is distributed. (Finneman Dep. at 122:5-11; 122:24-123:22; 124:23-125:7.)

**Finneman's Response:** Disputed as immaterial. McLeish testified that Finneman's conduct did not present a "safety concern." (Ex. 2, McLeish Dep. at 95:20-25). McLeish testified that "tolerances" are built into the weight of Delta's aircraft, and Finneman and her children could have checked a total of eight bags. (Id. at 96:1-9).

**Delta's SOF No. 20:** Moreover, improperly weighing and labeling bags, such as by failing to identify as "heavy" any bags over a certain weight limit, can impact the safety of airline personnel handling the bags and could potentially even affect flight safety. (Finneman Dep. at 125:1-18.)

**Finneman's Response:** Disputed as immaterial. McLeish testified that Finneman's conduct did not present a "safety concern." (Ex. 2, McLeish Dep. at 95:20-25). McLeish testified that "tolerances" are built into the weight of Delta's aircraft, and Finneman and her children could have checked a total of eight bags. (Id. at 96:1-9.)

[Finneman does not dispute Delta's SOF Nos. 21-22]

**Delta's SOF No. 23:** Such "waiver/favor" violations include waiving fare rules; extending ticketing deadlines; failing to collect change or refund fees; waiving bag fees; reassigning seats in ineligible classes of service; overbooking; and improper upgrades and fare adjustments. (The Way We Fly at 21; Dkt. No. 40 at 5 and Dkt. No. 50.)

**Finneman's Response:** Disputed. "The Way We Fly" (Delta's Ex. 3 at p. 21) does not specifically refer to "waiving bag fees."

[Finneman does not dispute Delta's SOF No. 24]

**Delta's SOF No. 25:** She also understood that improperly providing waivers or favors, including through the unauthorized waiver of bag fees, not only violates Company policy, but also constitutes theft from Delta. (The Way We Fly at 21; Finneman Dep. at 116:16-119:1; 131:13-132:24.)

**Finneman's Response:** Disputed. Nowhere in the cited testimony did Finneman confirm that "improperly providing waivers" constitutes "theft from Delta." Finneman was asked about

6

"theft" only once, and she did not connect "improper waivers" to theft. (See Ex. 1, Finneman Dep. at 131:17-19).

[Finneman does not dispute Delta's SOF Nos. 26-29]

**Delta's SOF No. 30:** Plaintiff presented four bags to be checked in, all of which were weighed by Ms. Alusa, and two of which were over the 50-pound weight limit (one weighed 58 pounds, the other weighed 65 pounds). (Finneman Dep. at 177:19-22; Alusa Dep. at 12:19-24; 20:2-11.)

**Finneman's Response:** Disputed insofar as Delta is claiming that Finneman knew the weights of the bags or that she knowingly presented two bags over 50 lbs. The cited testimony does not support the above statement. To the contrary: Alusa told Finneman that two of the bags were overweight, but she did not state how much the bags weighed, and Finneman did not know how much the bags weighed. (Ex. 1, Finneman Dep. at 157:16-25, 158:1). Finneman had traveled frequently over the past 22 years, she had an idea of whether a bag weighs 50 lbs., and she did not think her bag was overweight when she presented it. (Id. 167:6-11).

[Finneman does not dispute Delta's SOF Nos. 31-33]

**Delta's SOF No. 34:** According to witnesses, Plaintiff then asked Ms. Alusa to waive the overweight bag fees for the two overweight bags. (Alusa Dep. at 14:17-19; Ex. 8, Email from N. Alusa.) Ms. Alusa refused to violate company policy, but told Plaintiff several times that Plaintiff could re-pack and redistribute the weight between her overweight and underweight bags. (Alusa Dep. at 14:23-24; 29:8-10.)

**Finneman's Response:** Disputed. Finneman did not ask Ms. Alusa, Mr. Abbott, or anyone else to waive an overweight baggage fee. (Ex. 1, Finneman Dep. at 224:25, 225:1-2,

182:17-19). In the above statement, Delta refers to "witnesses," but then cites the testimony of only one witness, Ms. Alusa.

Alusa told Finneman two of her bags were overweight, and that she was calling another OSM to get a baggage waiver. In response, Finneman said that was not necessary, and her children would rearrange the bags because she was allowed eight bags total. (Id. at 164:1-11).

During the bag check-in process, Finneman was finishing a job she needed to complete before her flight and she was looking for an envelope. (Id. at 160:23-25). Finneman dropped off her bags but then left immediately to finish up what she was doing and get an envelope. (Id. at 161:1-9). Finneman asked her children to reshuffle the bags but she does not know whether that actually occurred. (Id. at 173:3-20)

In her first statement to Mr. McLeish (dated January 2, 2018) regarding the "incident," Finneman noted the following: she was told by the "agent" that two of the bags were overweight, she told her children to rearrange the bags, she then went to look for an envelope to place paperwork she was working on the previous night, and to ensure that she was able to get her family on the flight on time, she "decided to finish up the check in." (See Delta's Ex. 14). Finneman admitted that checking herself in was a "lapse in judgment," but she did not admit— and has never admitted—that she asked for a waiver of any overweight baggage fees. (Id.)

On January 6, 2018, Finneman submitted a second written statement to McLeish. In that statement, she reiterated what she said in the first statement, but added the following: "I believe Nikki [Alusa] made an assumption that I was looking for a baggage waiver rather than asking me to rearrange the bags which we would normally do for our internal and external customers in the same situation." (See Delta's Ex. 15). Finneman also stated, again, that she "did not ask for

waivers as evident in our ability to move bag weight around prior to checking bags." (Id.)

Delta's own "timeline" of events also confirms that Finneman denied asking for a waiver of an overweight bag. (See Delta's Ex. 17, January 6 entry on the timeline).

**Delta's SOF No. 35:** Witnesses also reported that, rather than redistribute the weight across her bags, Plaintiff repeatedly asked Ms. Alusa to "send the bags heavy," meaning that Ms. Alusa should improperly waive Plaintiff's overweight bag fees and simply mark the bags as under the weight limit. (Alusa Dep. at 22:20-22; 29:12-13; Ex. 8, Email from N. Alusa.)

**Finneman's Response:** Disputed. Finneman denied Alusa's allegations on this point. (Ex. 1, Finneman Dep. at 168:6-12). In the above statement, Delta refers to "witnesses," but then cites the testimony of only one witness, Ms. Alusa. Finneman refers to her response to Delta's SOF No. 34 (which establishes that Finneman denied requesting a waiver of baggage fees), which is incorporated herein by reference.

**Delta's SOF No. 36:** Witnesses also stated that Ms. Alusa then called over "red coat" Cory Abbott, and Plaintiff asked Mr. Abbott to waive the overweight charges for Plaintiff's bags. (Alusa Dep. at 18:14-21; 19:6-9; 19:18-21; 22:11-15; Ex. 9, Email from C. Abbott.) Like Ms. Alusa, Mr. Abbott also refused to violate Company policy in this fashion. (Alusa Dep. at 19:6-13.)

**Finneman's Response:** Disputed. Finneman did not ask Ms. Alusa, Mr. Abbott, or anyone else to waive an overweight baggage fee. (Ex. 1, Finneman Dep. at 224:25, 225:1-2, 182:17-19). Finneman refers to her response to Delta's SOF No. 34, which is incorporated herein by reference.

**Delta's SOF No. 37:** Witnesses reported—and Plaintiff herself admits—that Plaintiff

then stepped behind the counter, manually entered that her two bags weighed 50 pounds (and thus met the weight limit), and then printed her bag tags and completed the check-in process. (Finneman Dep. at 169:19-23; 171:10-19; Ex. 8, Email from N. Alusa; Stetler Dep. at 13:13-15:21; Email from M. Stetler to K. Nabors, et al., dated January 20, 2018, attached as Exhibit 10.)

**Finneman's Response:** Disputed. Finneman's testimony differs from Alusa's allegations.

Finneman stepped behind the customer service counter and checked her bags in. (Ex. 1, Finneman Dep. at 169:19-23). Finneman testified that she did not recall inputting the weight of her bags as 50 lbs., but testified that it was "possible." (Id. at 170:17-24). Finneman printed the tag, but she did not tag or send the bags through. (Id. at 172:20-24). When Finneman printed the tag, the bags were not on the scale. (Id. at 176:24-25, 177:1).

Finneman confirmed that she stepped behind the counter to check herself because she was running late, and she thought Ms. Alusa was not capable of completing the transaction. Finneman also testified that she did not want to put Alsua in a situation similar to another Delta employee (Uini), so she made the decision to finish the check-in process. (Id. at 193:1-23). The "Uini situation" that Finneman referred to involved another employee (Uini) whose employment was terminated after "something to do with ticketing." (Id. at 215:4-9).

There is no Delta policy that prohibited employees from checking themselves in to a flight, including checking in baggage. (Id. at 133:10-21). Finneman has observed other Delta employees checking their own bags in. (Id. 133:22-25, 134:1-4)

Finneman also notes that insofar as Delta is relying on Mr. Stetler's testimony, he did not

observe the events of December 17, 2017 and lacks any personal knowledge of those events. See Fed. R. Evid. 602 (witness must have personal knowledge).

**Delta's SOF No. 38:** Although Plaintiff maintains that she asked her children to redistribute weight between the overweight and underweight bags, Ms. Alusa testified Plaintiff never made any such request. (Finneman Dep. at 165:23-25; Alusa Dep. at 22:23-23:2; Ex. 8, Email from N. Alusa.)

**Finneman's Response:** Undisputed, but Delta's own statement confirms that Alusa's testimony conflicts with Finneman's testimony on this point.

**Delta's SOF No. 39:** In any event, Plaintiff admits that she does not know if her children redistributed the weight between their bags. (Finneman Dep. at 166:16-19; 174:3-13; 175:12-13; 209:10-17.) Delta's review of the video evidence during the investigation leading to Plaintiff's termination did not show that Plaintiff's children redistributed the weight. (McLeish Dep. at 48:14-21; see also Ex. 8, Email from N. Alusa.)

**Finneman's Response:** Disputed. While Finneman did not personally witness her children reshuffling the bags because she was looking for an envelope to finish up a job she was working on the previous night, she also testified that she had no reason to believe that her children did not comply with her request to reshuffle the bags. (Delta Ex. 1, Finneman Dep. at 173:3-24). She also testified that she reasonably believed her children reshuffled the bags:

> Q: Sitting here today, though, you have no idea if they did.
> [Objection to question]
> A: I still –up until today, I do believe that they–they followed my directions as the mom.

> (Id. at 174:3-9)

> Q: My question is if the bag really weighed 65 pounds --

A: Which --
Q: and you put it in as 50 and sent it through, that's wrong; right?
[Objection]
A: But I believe my children had moved the weight.

(Id. at 175:17-24)

In other words, Finneman did not have any intent to deceive Delta. She reasonably
believed her children reshuffled the content of the bags so they were not overweight.

**Delta's SOF No. 40:** Plaintiff admits that she knew that entering inaccurate bag weights
was a clear policy violation. (Finneman Dep. at 163:18-24; 177:19-22.) Notwithstanding this, she
also admits that she did not re-weigh the bags at any time before, or after, she stepped behind the
counter and changed the bag weights in the computer system and printed her own bag tags.
(Finneman Dep. at 175:12-13; 177:19-22; 209:10-17.)

**Finneman's Response:** Disputed. Delta mischaracterizes the deposition testimony.
Neither the deposition question nor the answer was clear on whether Finneman reweighed the
bags "at any time before, or after, she stepped behind the counter":

Q: Did you ever reweigh the bags after they were allegedly --
A: No.
Q: Okay. Reweigh the bags.

(Delta Ex. 1, Finneman Dep. at 209:15-18)

Further, none of the testimony cited establishes that Finneman "changed the bag weights
in the computer system." That assertion lacks any foundational support.

Finneman refers to her responses to Delta's SOF Nos. 37 and 39, which are incorporated
herein by reference.

**Delta's SOF No. 41:** As a result, Plaintiff avoided paying bag fees by entering inaccurate
bag weights. (Finneman Dep. 157:13-158:7; 166:16-19; 174:3-13; 175:12-13; 191:20-23;

193:12-23; Ex. 8, Email from N. Alusa.)

**Finneman's Response:** Disputed. Delta again mischaracterizes the deposition testimony. *None* of the cited testimony establishes that Finneman "avoided paying bag fees by entering inaccurate bag weights," as alleged above.

Finneman did not know the weight of the two (allegedly "overweight") bags. (Ex. 1, Finneman Dep. at 157:16-25, 158:1). Finneman had traveled frequently over the past 22 years, and she had an idea of whether a bag weighs 50 lbs., and she did not think her bags were overweight when she presented them. (Id. 167:6-11).

Finneman testified that she did not recall inputting the weight of her bags as 50 lbs., but testified that it was "possible." (Id. at 170:17-24). Finneman printed the tag, but she did not tag or send the bags through. (Id. at 172:20-24).

**Delta's SOF No. 42:** On December 20, 2017, Delta received an anonymous helpline complaint regarding Plaintiff's misconduct. (Helpline Report, dated December 20, 2017, attached as Exhibit 11.)

**Finneman's Response:** Disputed. Pursuant to Fed. R. Civ. P. 56(c)(2), Finneman objects to the anonymous helpline complaint as inadmissible hearsay that is being used to prove the truth of the matter asserted. See Fed. R. Evid. 801, 802. In addition to the entire anonymous complaint being hearsay, there are double hearsay comments contained therein: "The caller said other employees notified Maria Tonga, ticket counter supervisor, of [Finneman's] bag weight falsification." The declarant is not identified in either layer of hearsay, rendering the comments unreliable, unpersuasive, and not admissible. *See Advance Am. Cash Advance Ctrs., Inc. v. FDIC*, 2017 U.S. Dist. LEXIS 27887, *21, (D.D.C. Feb. 23, 2017) (Holding that anonymous

double hearsay was "unreliable and of little persuasive value").

**Delta's SOF No. 43:** Delta, therefore, conducted a prompt and thorough investigation of the allegations by reviewing surveillance footage and electronic check-in data, and collecting witness statements, including from Plaintiff. (McLeish Dep. at 65:15-66:4; 71:22-72:1, 74:12-20; Stetler Dep. at 11:22-24; 13:13-15:12; Email from D. McLeish to T. Klekas, et al., dated January 2, 2018, attached as Exhibit 12; Ex. 8, Email from N. Alusa; Ex. 9, email from C. Abbott; Ex. 10, Email from M. Stetler to K. Nabors, et al.; Email from R. Navarro to K. Stowe dated January 4, 2018, attached as Exhibit 13; Email from A. Finneman to D. McLeish, dated January 2, 2018, attached as Exhibit 14; Email from A. Finneman to D. McLeish, dated January 6, 2018, attached as Exhibit 15; Email from M. Tonga to D. McLeish, dated January 20, 2018, attached as Exhibit 16; Investigation Timeline, attached as Exhibit 17.)

**Finneman's Response:** Disputed. McLeish's "investigation" was untimely, incomplete, flawed, and biased.

McLeish did not personally observe the events of December 17, 2017, which was a Sunday. (Ex. 2, McLeish Dep. at 31:4-9). Finneman made no attempt to conceal her conduct. She called Mr. McLeish on December 17, 2017 (the same day as the alleged "incident") and advised him that she checked herself into the flight. (See Delta's Ex. 17). McLeish could not identify a specific Delta policy that prohibited Finneman from checking herself in. (Ex. 2, McLeish Dep. at 31:22-25, 32:1-3). McLeish never specifically instructed Finneman that she was prohibited from checking herself in for the flight. (Id. at 32:4-7)

McLeish first met with Finneman to discuss the events on January 2, 2018. (Id. at 28:8-18). McLeish spoke with Finneman about the incident again on January 5, 2018, but he could not

recall what she told him. (Id. 44:1-16).

McLeish led Finneman to believe there was nothing to worry about and that there was no investigation. (Ex. 1, Finneman Dep. at 213:8-15). McLeish told Finneman, "Just continue what you're doing. You're doing great. I haven't heard anything." (Id. at 213:23-24).

The video footage of the ticket counter does not contain any audio. By just looking at the video, the viewer would not know what Finneman (or anyone else) said or did not say. (Ex. 2, McLeish Dep. at 39:5-14)

Roland Navarro is (or was) employed with Delta as a PSA (referred to as a "red coat").[3] (Id. at 40:15-20). According to Delta's "timeline," Navarro "advised" department manager Keith Stowe that Finneman stated that Alusa would not waive overweight bag fees. (See Delta's Ex. 17). However, in an email dated January 4, 2018, Navarro stated that he did not "remember much about the Finneman deal," that he was "throwing bags at position #4 due to long lines, and he "vaguely remember [Finneman] coming down to advise [Navarro] that the agent (Nikki Alusa) would not waive her heavy bags." (Id.).

McLeish also testified that he "probably should have asked [Navarro] to expand a little more on that." (Ex. 2, McLeish Dep. at 66:11-12). McLeish specifically relied on Navarro's email in concluding that Finneman's version of events were less credible than Abbott's. (Id. at 65:25, 66:1-4). Despite this information, McLeish did not speak with Navarro about the incident. (Id. at 42:14-16).

Cory Abbott is (or was) a red coat with Delta. (Id. at 43:10). Delta's Ex. 9 is an unsworn statement from Mr. Abbott dated January 20, 2018, wherein he describes the events of December

---

[3] Delta red coats work at the ticket counter and supervise frontline customer service agents. (Ex. 2, McLeish Dep. at 40:25, 41:1-5)

17, 2017. (See Delta's Ex. 9). Despite Abbott's statement, McLeish did not speak with him about the incident. (Ex. 2, McLeish Dep. at 50:13-16).

Kit Keller is (or was) a "ramp employee" with Delta who visits the customer service counter to check on bag status and bag "hygiene." (Id. at 51:6-11). In his statement, Abbott claimed that Keller approached him on December 17 and stated that Finneman wanted to speak with him. (See Delta's Ex. 9). McLeish testified that he thought Keller was "in the vicinity." (Ex. 2, McLeish Dep. at 66:12-13). Despite this information, McLeish did not speak with Keller about the December 17 incident. (Id. at 51:18-20).

McLeish withheld Alusa's and Abbot's written statements from Finneman and did not provide her with an opportunity to respond to those statements. (Id. at 53:4-6, 64:3-7).

Delta's Exhibit 10 is an email from Mr. Stetler dated January 20, 2018, which allegedly lists how the bags were entered into Delta's computer system. The exhibit purports to show flight numbers with corresponding baggage weights, and the "sine" entries from Ms. Alusa and Ms. Finneman. (Ex. 2, McLeish Dep. at 55:8-25 – 58:1-11). Despite relying on the bag entry document, McLeish withheld it from Finneman and did not give her an opportunity to respond to it. (Ex. 2, McLeish Dep. at 58:21-23).

Maria Tonga was Ms. Alusa's direct supervisor. (Id. at 61:4-9). Ms. Tonga submitted a written statement to McLeish on January 20, 2018. (See Delta's Ex. 16). Ms. Tonga's statement establishes she did not observe the events of December 17 and lacks personal knowledge of those events. (Id.) McLeish did not share Ms. Tonga's email with Finneman and give her an opportunity to respond to it. (Ex. 2, McLeish Dep. at 70:2-5).

In email from Mr. McLeish to Mr. Klekas (Delta's Customer Service Director) dated

January 21, 2018, McLeish lists a "timeline" of events, he stated that he had obtained statements from Finneman, Ms. Alusa, Ms. Tonga, Mr. Abbot, and Mr. Navarro, and that "after reviewing cameras," he needed statements from Mr. Keller (who he claims "observed [the] incident"), Geoffrey Wilde (ticket counter agent next to Alusa during the incident), and Ping Woo (agent who escorted Finneman to the front of the line). (See Ex. 3, email from McLeish). McLeish testified he created the timeline purely by viewing the video footage. (Ex. 2, McLeish Dep. at 79:10-12).

McLeish did not speak with Mr. Wilde about the December 17 incident and did not obtain a statement from him. (Id. at 77:4-8). McLeish did not speak with Ms. Woo about the incident and did not obtain a written statement from her. (Id. at 78:17-24).

**Delta's SOF No. 44:** For example, Ms. Alusa described Plaintiff's repeated attempts to get Ms. Alusa to waive Plaintiff's bag fees, and Plaintiff's refusal to repack her bags, before Plaintiff stepped behind the counter and waived the fees for herself. (Ex. 8, Email from N. Alusa.) Likewise, Mr. Abbott refused to improperly waive Plaintiff's bag fees. (Ex. 9, email from C. Abbott.)

**Finneman's Response:** Disputed. Finneman did not ask Ms. Alusa, Mr. Abbott, or anyone else to waive an overweight baggage fee. (Ex. 1, Finneman Dep. at 224:25, 225:1-2, 182:17-19). She also did not "waive the fees for herself." Finneman refers to her response to Delta's SOF Nos. 34, 35, 37, 39, and 41, all of which are incorporated herein by reference.

**Delta's SOF No. 45:** And "red coat" Roland Navarro reported that Plaintiff told him that Ms. Alusa refused to waive Plaintiff's bag fees. (Ex. 13, email from R. Navarro.) In fact, Plaintiff repeatedly admitted to a "mistake" and a "lapse in judgment." (Ex. 14, Email from A.

Finneman dated January 2, 2018; see also Email from A. Finneman to R. Finneman, dated February 2, 2018, attached as Exhibit 18.)

**Finneman's Response:** Disputed. In his email dated January 4, 2018, Navarro stated that he did not "remember much about the Finneman deal," that he was "throwing bags at position #4 due to long lines, and he "vaguely remember [Finneman] coming down to advise [Navarro] that the agent (Nikki Alusa) would not waive her heavy bags." (See Delta's Ex. 13). McLeish also testified that he "probably should have asked [Navarro] to expand a little more on that." (Ex. 2, McLeish Dep. at 66:11-12).

The "mistake" Finneman referred to in her statement was finishing up her check-in process; it had nothing to do with "waiving" or requesting to waive an overweight baggage fee. (Ex. 1, Finneman Dep., at 220:4-11). Regarding her "lapse of judgment" comment, Finneman testified as follows:

> Q: Why would you say that?
> A: Because that's what Maria [Tonga[ and Don [McLeish] had expressed to me, that you finish -- you finish checking yourself in. So they gave me that impression that doing that was wrong. But not once in my statement or any conversation with Don and Maria that I told them I gave myself a waiver, because I did not.
>
> (Ex. 1, Finneman Dep. at 221:5-12).

In more direct terms, the "lapse of judgment" comment referred to the check-in process; it did ***not*** refer to requesting or receiving any type of "baggage waiver."

> [Finneman does not dispute Delta's SOF No. 46, but the reasons set forth, *supra*, she disputes that Delta's so-called "evidence" is accurate, or that it presented legitimate reasons for the summary termination of her employment.]

**Delta's SOF No. 47:** Plaintiff also does not dispute that marking an overweight bag as underweight would be a violation of Delta policy, and that such a violation is a terminable

offense. (Finneman Dep. at 163:18-24; 177:19-22.)

**Finneman's Response:** Disputed. Delta again mischaracterizes the deposition testimony.

The cited testimony is as follows:

> Q: So you're aware that Delta terminated folks who vi- -- who --
> A: Of course, yeah.
> Q: -- waived fees inappropriately?
> A: I do, yeah.
> Q: So it's a terminable offense?
> A: Yes.

> (Delta Ex. 1, Finneman Dep. at 163:18-24)

In other words, Finneman did not specify that "marking an overweight bag as underweight" is a "terminable offense." She merely referred to unspecified "waived fees."

**Delta's SOF No. 48:** As a result of its investigation, Delta found credible the allegation that Plaintiff had improperly waived her own bag fees by underreporting the weight of her bags. Delta also concluded that Plaintiff had been untruthful during Delta's investigation. (McLeish Dep. at 65:15-66:4 (finding Ms. Alusa's version of events "very convincing"); 75:2-17; Finneman Dep. 223:1-225:7; 226:14-25; Memorandum from K. Nabors to J. Jessup, dated January 29, 2018, attached as Exhibit 19; Memorandum from D. McLeish to T. Klekas, attached as Exhibit 20.)

**Finneman's Response:** Disputed. Mr. Nabors and Mr. Jessop did not interview any witnesses; the record establishes that they relied on information provided to them by Mr. McLeish. For the reasons set forth in Finneman's response to Delta's SOF No. 34, McLeish's "investigation" was untimely, incomplete, flawed, and biased.

The record shows there were only two individuals who saw and heard what was discussed at the ticket counter: Ms. Finneman and Ms. Alusa. There are several reasons to doubt

Ms. Alusa's credibility. In her written statement, Alusa refers to the incident occurring at 12:30 p.m. (See Delta's Ex. 8). However, McLeish listed the incident as occurring at 7:17 a.m. (Ex. 3, Email from McLeish). When asked about this discrepancy, Alusa did not know which start time was correct. (See Delta's Ex. 7, Alusa Dep. at 23:13-17)

Ms. Alusa had a powerful motive to get Finneman fired. Alusa believed that Finneman was involved in Delta's decision to terminate her sister's employment. (Ex. 1, Finneman Dep. at 199:19-25, 200:1-25, 201:1-21).

McLeish admitted that it did not make sense that Finneman would jeopardize over two decades of employment with Delta to avoid paying two overweight baggage fees. (Ex. 2, McLeish Dep. at 85:7-23). McLeish estimated the overweight baggage fee to be between $100 and $150. (Id. at 81:6-11).

And as noted previously, Ms. Finneman did not knowingly present any overweight bags to be checked in. (See Finneman's response to Delta's SOF Nos. 30 and 41). Finneman did not ask Ms. Alusa, Mr. Abbott, or anyone else to waive an overweight baggage fee. She reasonably believed that her children rearranged the bags. (See Finneman's responses to Delta's SOF Nos. 34 and 39). Finneman never asked Alusa to "send the bags heavy." (See Finneman's response to Delta's SOF No. 35). Finneman checked herself into the flight, but there is no Delta policy that prohibited her from doing so. (See Finneman's response to Delta's SOF No. 37). Finneman testified that she did not recall inputting the weight of her bags as 50 lbs.; she printed the bag tag, but she did not send the bags through. (See Finneman's response to Delta's SOF No. 41).

**Delta's SOF No. 49:** After Delta determined that Plaintiff had intentionally violated the waiver/favor policy, Delta concluded that Plaintiff's conduct warranted termination. (Ex. 19,

Memorandum from K. Nabors; Ex. 20, Memorandum from D. McLeish.)

**Finneman's Response:** Disputed. Finneman refers to her responses to Delta's SOF, *in toto*, and she refers to her statement of additional material facts, *infra*.

**Delta's SOF No. 50:** This was because her conduct was dishonest, constituted theft, and was particularly egregious given her status as a leader. (McLeish Dep. at 80:20-81:14; 85:16-86:6; Stetler Dep. at 34:24-36:9; Ex. 19, Memorandum from K. Nabors; Ex. 20, Memorandum from D. McLeish.)

**Finneman's Response:** Disputed. Finneman did not act dishonestly, she did not commit any "theft," and her conduct was not "egregious." Finneman refers to her responses to Delta's SOF, *in toto*, and she refers to her statement of additional material facts, *infra*.

**Delta's SOF No. 51:** Delta takes violations like these very seriously, and theft in any form is not tolerated. (McLeish Dep. at 81:1-5; Stetler Dep. at 34:24-35:8.)

**Finneman's Response:** Disputed. Finneman did not commit the "violations" alleged, and she did not commit any act of "theft." Finneman refers to her responses to Delta's SOF, *in toto*, and she refers to her statement of additional material facts, *infra*.

[Finneman does not dispute Delta's SOF Nos. 52 or 53, but she denies that they are relevant or material.]

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

**Finneman's SOF No. 1:** Finneman's employment with Delta, which started in 1995 and spanned over two decades, involved promotions from baggage service agent, to reservations, to ramp agent, to customer service agent, to passenger service agent (red coat), and to Operations Service Manager ("OSM"). (Ex. 1, Finneman Dep. at 91:6-12, 92:22-25, 93:1-15, 97:11-15, 100:12-22, 101:16-24).

**Finneman's SOF No. 2:** In over 22 years of service to Delta, Finneman's job performance was excellent. Mr. Stetler observed Finneman performing her job two to three times per week, and he "perceived" Finneman's job performance to be "strong." (See Delta's Ex. 6, Stetler Dep. at 7:2-12, 8:7-10, and 10:9-18). According to Stetler: "The team liked [Finneman], she was likable by our employees, engaged with the daily operation, positive demeanor." (Id. at 10:19-22)

**Finneman's SOF No. 3:** McLeish assessed Finneman's job performance as "effective." McLeish believed Finneman was a "good leader" who took good care of her employees. McLeish believed Finneman was "very responsive and responsible and communicated well with [McLeish] on items that were going on." McLeish had "no issues with [Finneman's] performance." (Ex. 2, McLeish Dep. at 21:10-22).

**Finneman's SOF No. 4:** The performance reviews Delta produced in this action reinforce the assertion that Finneman's performance was excellent:

> 2001 Review: acceptable and "exceeds" in customer service, quality, and productivity
> 2002 Review: acceptable and "exceeds" in customer service, quality, and productivity
> 2003 Review: "exceeds" in customer service, quality, and productivity
> 2004 Review: "exceeds" in customer service, quality, and productivity
> 2005 Review: "exceeds" in customer service, quality, and productivity
> 2006 Review: "exceeds" in customer service, quality, and productivity
> 2007 Review: meets or exceeds in multiple areas of customer service, interpersonal skills, and compliance
> 2008 Review: exceeds in all areas measured for customer service and interpersonal skills

> (See Ex. 4, Finneman's Performance Reviews).

**Finneman's SOF No. 5:** Finnman also received commendations for her "exceptional performance." (See Ex. 5, Commendations Memoranda).

22

**Finneman's SOF No. 6:** Finnman received multiple compliments from customers. (See Ex. 6, customer compliments). Those compliments include:

> "Very helpful . . . went over and beyond helping us . . . life saver" (Id. at DELTA 304)
> "Helpful and pleasant" (Id. at DELTA 390)
> "Just wonderful . . . helped me so much" (Id. at DELTA 391)
> "Very kind and considerate" (Id. at DELTA 395)
> "Courteous manner and great patience . . . great representative for Delta" (Id. at DELTA 396)
> "Great service at check in" (Id. at DELTA 306)

**Finneman's SOF No. 7:** On August 29, 2017 (less than four months preceding the December 2017 incident), Keith Stowe (Department Manager for Delta's above-wing operations) recommended Finneman for the "Best in the West" award. The "Best in the West" is a recognition program for excellent performance. Stetler approved Stowe's recommendation. (See Delta Ex. 6, Stetler Dep. at 8:7-10, 21:6-10; see also Finneman's Ex. 7, Emails between Stowe and Stetler).

**Finneman's SOF No. 8:** To better understand the chain of command at Delta: Mr. McLeish was employed with Delta as a Department Manager for below-wing operations (a "ramp manager"). (Ex. 2, McLeish Dep. at 12:9-25, 13:1-12). McLeish was Finneman's direct supervisor. (Id. at 16:18-20). The other below-wing department manager was Mr. Stetler, before he was promoted to General Manager in "early 2020 or late in 2019." (Id. at 14:13-20). The above-wing manager was Keith Stowe. (Id. at 14:24-25, 15:1).

**Finneman's SOF No. 9:** McLeish did not ever issue any type of written warning or written performance discipline to Finneman. He never placed Finneman on a performance improvement plan, suspension, or probation. (Ex. 2, McLeish Dep. at 23:14-23).

**Finneman's SOF No. 10:** When Finneman transferred from Houston to Salt Lake City,

McLeish testified he that Delta's "leadership team" conducted interviews. While McLeish said he was "supportive" of Finneman transferring to Salt Lake, he was not sure that he was the one who interviewed Finneman. (Ex. 2, McLeish Dep. at 17:13-25. 18:6-12).

**Finneman's SOF No. 11:** McLeish knew Finneman was of Asian descent and knew the color of her skin. He also heard Finneman discussing her parents in the Philippines. (Ex. 2, McLeish Dep. at 20:1-14).

**Finneman's SOF No. 12:** McLeish was the individual who made the termination recommendation, which was ultimately approved by Mr. Klekas. (See Ex. 8, emails between McLeish and Klekas). In the email, "RFT" refers to "request for termination." (Ex. 2, McLeish Dep. at 80:1-2). By the time McLeish sent that email, he had made up this mind that he wanted to terminate Finneman's employment. (Id. at 80:14-19). In the "RFT" email, McLeish recommended termination based on the following:

> "Given the gravity of this infraction (waiving her own overweight bag fees, following agent and PSA's declining her request), and the fact that [Finneman] appears to not be truthful by failing to admit that she was asking for a waiver from the ticket counter employees, so as to avoid her having to pay fees on these items."

(See Ex. 8)

**Finneman's SOF No. 13:** After estimating the overweight baggage fee to be between $100 and $150, McLeish testified that it was a "revenue issue" that justified Finneman's termination. (Ex. 2, McLeish Dep. at 81:1-14).

**Finneman's SOF No. 14:** Allegations of discrimination directed at Pacific Islanders were made by another Delta employee. Taniela Pahulu is (or was) employed with Delta as a ramp employee. (Delta Ex. 6, Stetler Dep. at 17:22-23). In an email from Ms. Pahulu dated

September 21, 2017 (about three months before the "incident" involving Finneman), she referred

to:

> "Prejudice, and undertones of Racial Discrimination of Pacific Islanders of Tongan Descent!! After meeting with you and having you hear me out and discussing things with you, I felt at ease with everything and trust you can find the proper resolution to the things we have discussed! Hopefully the complaints that I brought to light today will help change the work culture for the better in Department 120 of Delta Airlines in Salt Lake City . . ."

> (Ex. 9, email from T. Pahulu)

**Finneman's SOF No. 15:** McLeish testified that another below-wing OSM (with the

initials "LW") caused "significant" damage to a Delta aircraft. However, McLeish did not

recommend that LW's employment be terminated. McLeish referred to LW's conduct as an

"oversight." LW is a white male. (Ex. 2, McLeish Dep. at 97:4-25, 98:1-7).

**Finneman's SOF No. 16:** According to Delta's "Way We Fly" policies:

> When an employee fails to follow Delta's policies or meet performance requirements, any decision to take disciplinary action or terminate employment is made only after a rigorous process of review and usually only after an employee has received prior coaching. Of course, in some situations, the behavior or policy violation may be so serious that it, in and of itself, may warrant review for termination.

> (See Delta's Ex. 3, Way We Fly policy, page 13)

**Finneman's SOF No. 17:** In 2017, McLeish made misogynistic comments specific to

Finneman: "If we can just have all of our OSMs look pretty – look as pretty as [Finneman] and

smelling good as [Finneman], then we won't have so many people com- -- so many of our agents

complaining." (Ex. 1, Finneman Dep. at 257:3-15)

**Finneman's SOF No. 18:** Finneman applied for the administrative OSM position in

September 2017. (Ex. 1, Finneman Dep. at 136:2-11). Finneman characterized the position as a

promotion because it would allow the experience of working side by side with department managers and the field director, and handling administrative responsibilities. (Id. at 136:12-21)

**Finneman's SOF No. 19:** The administrative OSM position would have involved shift bid creation, payroll and scheduling, oversight, station financing and billing, and station event planning. (Delta Ex. 6, Stetler Dep. at 23:16-21).

**Finneman's SOF No. 20:** The administrative OSM position was a rotating position, and Finneman was "in line to get the position" because of her aspirations to "move up" with Delta and break what Finneman characterized as Delta's "boys club." (Ex. 1, Finneman Dep. at 136:22-25, 138:3-7).

**Finneman's SOF No. 21:** Mr. Stetler did not invite Finneman to apply for the administrative OSM position. She chose to apply on her own. (Ex. 1, Finneman Dep. at 140:21-25, 141:1-4).

**Finneman's SOF No. 22:** Delta selected Mr. Monette (a white male) for the position despite the fact that he has a "history of stepping down." (Ex. 1, Finneman Dep. at 138:8-12).

**Finneman's SOF No. 23:** After she was not selected for the administrative OSM position, Finneman complained to Mr. Stetler. Finneman said she was disappointed, and that she was subjected to discrimination because she is a female with brown skin. (Ex. 1, Finneman Dep. at 149:10-20). Shortly thereafter, on October 10, 2017, Stetler sent an email to Klekas wherein he stated: "I spoke with [Finneman] tonight so I think we have all our bases covered." (Ex. 11, Email from Stetler).

**Finneman's SOF No. 24:** Delta's "Way We Fly" policies prohibit the use of tobacco (including smokeless tobacco) unless it is used in "designated areas outside Delta buildings or

leased space before or after work hours and during authorized break periods." (Ex. 10, Delta's Way We Fly policy on tobacco use).

**Finneman's SOF No. 25:** Finneman reported to McLeish that three of her coworkers (all of whom are white males) were chewing tobacco in the workplace. Mr. McLeish said he "looked at their mouth" and claimed "nothing was there." That was the extent of his "investigation" into white males accused of violating the "Way We Fly" policies. (Ex. 1, Finneman Dep. at 262:8-20).

**Finneman's SOF No. 26:** Stetler spoke with McLeish about the circumstances leading to Finneman's termination on multiple occasions between the time period of December 17, 2017 and the date of her termination. (Delta Ex. 6, Stetler Dep. at 12:3-21). Stetler also "retrieve[d] the past-dated record" (Delta filed as its Exhibit 10) to "assist" with McLeish's investigation. (Id. at 13:10-21).

**Finneman's SOF No. 27:** Stetler supported McLeish's summary termination decision. Stetler concluded that Finneman should have been terminated, without warning, because she was "dishonest" and committed "theft." (Delta Ex. 6, Stetler dep. at 34:7-25, 35:1-4).

## <u>ARGUMENT</u>

### I.    **Legal Standard for Summary Judgment**

To be entitled to summary judgment, the movant must demonstrate there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is

"material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Thom*, 353 F.3d at 851, citing *Anderson*, 477 U.S. at 248.

In evaluating a motion for summary judgment, a reviewing court must view the evidence in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. Additionally, the court must draw all reasonable inferences in favor of the non-movant. *O'Shea v. Yellow Technology*, 185 F. 3d 1093 (10th Cir. 1999).

In employment discrimination cases where the employee relies on circumstantial evidence (like the instant case), the burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) applies. Our Supreme Court has emphasized the importance of circumstantial evidence in proving intent. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.") (internal citation omitted). Additionally, in cases alleging employment discrimination (like the instant case), the evidence must be evaluated based on the totality of the circumstances. *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 82 (1998).

## II.     Legal Standard for Title VII Employment Discrimination Claims

Title VII makes it unlawful for employers to discharge any individual, or to otherwise discriminate against any individual, with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1).

To establish a prima facie case of discrimination under Title VII, Finneman must show: (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.

*EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). The "critical prima facie inquiry" is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination. *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019).

A plaintiff may prove intentional discrimination through either direct or circumstantial evidence. *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999). Because Finneman seeks to prove her case through circumstantial (rather than direct) evidence, the burden-shifting framework of *McDonnell Douglas* apples.[4]

Finneman's prima facie burden is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). At the prima facie stage, Finneman is "only required to raise an inference of discrimination, not dispel the non-discriminatory reasons proffered by the defendant." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000).

## III. Finneman has Established a Prima Facie Case for Discrimination in Violation of Title VII

Finneman is female, she has brown skin, and she is from the Philippines. Thus, she satisfies the first element of her prima facie case. Delta's termination of Finneman's employment constitutes an adverse employment action. *See, e.g., McInerney v. United Air Lines, Inc.*, 463 Fed. Appx. 709, 716 (10th Cir. 2011). Accordingly, Finneman has satisfied the second element of her prima facie case.

---

[4] The U.S. Supreme Court has cautioned that the *McDonnell Douglas* burden shifting framework should not present a heavy burden for a plaintiff and was never intended to be "rigid, mechanized, or ritualistic." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978). The framework recognizes that "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." *U.S. Post. Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983).  Under the framework, a plaintiff need not present any particular type of evidence to prove her case and direct evidence is no more probative than circumstantial evidence of discrimination. *Desert Palace*, 539 U.S. 90, at 98-100.

For the third and final element of Finneman's prima facie case, there are multiple circumstances which give rise to the inference that McLeish made the termination decision based on his discriminatory intent.

Federal courts have recognized multiple types of circumstantial evidence to prove discriminatory intent, including suspicious timing, evidence showing that similarly situated employees outside the protected class received systematically better treatment, and evidence that the employer offered a pretextual reason for an adverse employment action. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014); *see also, Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 ("Proof that the defendant's explanation is unworthy of credence [i.e., pretextual] is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive"); *see also, Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 971 (8th Cir.1994) (evidence of pretext may be used to create the "requisite inference of unlawful discrimination through the McDonnell Douglas analysis")

"A plaintiff may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1200 (10th Cir. 2015) (internal citation omitted). Similarly, evidence that allows for an inference that the employer's proffered non-discriminatory reasons were either a *post hoc* fabrication or otherwise did not actually motivate the employment action is sufficient to establish pretext. *Plotke v. White*, 405 F.3d 1092, 1102-03 (10th Cir. 2005).

### A.    Finneman's 22 Years of Excellent Service Preceding Her Summary Termination is Evidence of Discriminatory Intent

Finneman was undeniably qualified for her OSM position. She had worked for Delta for over 22 years, she was promoted multiple times, her performance evaluations were all positive, and she received multiple commendations and accolades for her performance. By any objective measure, Finneman was an effective and productive OSM for Delta. (See Finneman's SOF Nos. 1-7). Delta would have this Court believe that McLeish (acting on behalf of Delta) disregarded Finneman's 22 years of exceptional service based on what he characterized as a "revenue issue" involving a $100-$150 baggage fee. (See Finneman's SOF No. 13). McLeish himself admitted this rationale did not make sense. (See Finneman's Response to Delta's SOF No. 49).

Delta's "Way We Fly" policy (the same policy that Delta heavily relies on in support of its termination decision) provides that termination occurs "usually only after an employee has received prior coaching." (See Finneman's SOF No. 16). Of course, McLeish did not provide any "prior coaching" given to Finneman and instead elected to summarily terminate her employment without any form of progressive discipline (e.g. written warning, performance improvement plan, or the "coaching" referenced in Delta's policy). Where an employer fails to progressively discipline the employee, fails to take the employee's past performance into consideration, and conducts a flawed investigation, a court may infer pretext. *Trujillo v. PacifiCorp,* 524 F.3d 1149, 1159-60 (10th Cir. 2008). Evidence that the employer acted contrary to a written or unwritten policy is evidence of pretext. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (internal citation omitted).

**B.      Delta's False Allegations Against Finneman is Evidence of Discriminatory Intent**

Finneman is acutely aware that Ms. Alusa accused her of requesting and processing the waiver of the baggage fees. She is likewise aware that Abbott has claimed that she requested the waiver. However, Finneman denies that she asked Ms. Alusa, Mr. Abbott, or anyone else to waive an overweight baggage fee. (See Finneman's responses to Delta's SOF Nos. 34, 36, and 43). In other words, Finneman alleges the entire reason Delta has proffered for termination is false. Falsity evidence is useful in discrimination and retaliation cases because it is a means of establishing pretext. *See Kendrick*, 220 F.3d at 1230. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Twigg v. Hawker Beechcraft Corp*., 659 F.3d 987, 1001 (10th Cir. 2011).

At the summary judgment stage, it would be improper for the Court to weigh the evidence or make a credibility assessment regarding the conflicting testimony from Finneman, Alusa, and Abbott. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves,* 530 U.S. at 150; *see also, Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008) ("On summary judgment, a district court may not weigh the credibility of the witnesses."); *McCleary v. Nat'l Cold Storage, Inc*., 67 F. Supp. 2d 1288, 1293 (D. Kan. 1999) ("[A] summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences.") (internal citation omitted).

Finneman also notes that insofar as Delta is claiming the termination decision was based on Finneman checking herself into the flight: (1) that is not listed as the reason for termination in

Mr. McLeish's "RFT" recommendation (See Ex. 8, wherein McLeish refers to waiving baggage fees and "untruthful" as the reasons for termination); (2) there is no Delta policy that prohibited employees from checking themselves into a flight, including baggage; and (3) Finneman observed other Delta employees checking in their own bags. (See Finneman's response to Delta's SOF Nos. 37 and 43).

### C. McLeish's Flawed, Biased, and Incomplete Investigation is Evidence of Discriminatory Intent

The Tenth Circuit has held where an employer conducts a flawed investigation that leads to termination, a court can infer pretext. *See Trujillo, supra*, at 1159-60 (10th Cir. 2008) (Flaws in employer's investigation, including the failure to interview an important witness, contributed to inference of pretext).

McLeish's "investigation" was flawed from its inception. McLeish did not bother to interview witnesses who may have had knowledge of relevant facts, including Mr. Navarro, Mr. Abbott, Mr. Keller, Ms. Tonga, Mr. Wilde, and Ms. Woo. (See Finnemnan's response to Delta's SOF No. 43).

McLeish had no intent of involving Finneman in his investigation or sharing relevant information regarding the investigation with her. In fact, McLeish falsely led Finneman into believing that there was no investigation, that she was "doing great," and that he had not "heard anything." (Id). McLeish withheld the written statements he obtained from Alusa, Abbott, Tonga, and Navarro, and he did not provide Finneman with any opportunity to respond to those written statements. (Id). McLeish also withheld (and did not provide Finneman with an opportunity to respond to) Mr. Stetler's email which purported to show flight numbers with corresponding baggage weights, and the "sine" entries from Ms. Alusa and Ms. Finneman. (Id).

Delta places heavy emphasis on the video of the ticket counter on December 17 (which it failed to file as an exhibit to its motion), but McLeish himself acknowledged that video does not contain audio, and as such, there is no way to determinate what was said or not said.

In totality, the record demonstrates that McLeish began with his desire to terminate Finneman's employment, and he then tailored his "investigation" in a way that would justify that predetermined outcome. As noted above, McLeish's flawed investigation is evidence of pretext, which in turn is evidence of discriminatory intent.

### D.    McLeish's Preferential Treatment Directed to White Male Employees is Evidence of Discriminatory Intent

In Title VII cases (like the instant case), comparator evidence—that similarly-situated employees outside of the plaintiff's protected class were treated more favorably—is relevant evidence of discrimination at the prima facie stage. *See, e.g., PVNF*, 487 F.3d at 800-801. It is also relevant to prove pretext. *See, e.g. Trujillo, supra*, at 1158 (10th Cir. 2008). In evaluating whether another employee is a "comparator" for evidence of discrimination, the employee must have been "similarly situated," which means they were subject to the same standards governing performance evaluation and discipline, and were engaged in conduct of comparable seriousness. *PVNF*, 487 F.3d at 801.

Similarly situated employees are those who have similar jobs, are subject to similar performance standards and report to the similar chain of command. *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). Absolute congruence between the plaintiff and the comparator is not necessary. *Smothers v. Solvay Chemicals, Inc*., 740 F.3d 530, 541 (10th Cir. 2014). In evaluating comparator evidence, the alleged workplace violations at issue do not have to be identical, but they do need to be of comparable seriousness. *Elmore v. Capstan, Inc*., 58

F.3d 525, 530 (10th Cir. 1995); *see also, Smothers, supra*, at 541.

As previously noted, McLeish has characterized the conduct leading to Finneman's termination as a "revenue" issue. A white male employee under McLeish's supervision (LW) caused substantial damage to a Delta aircraft, which is undeniably also a "revenue" issue. However, McLeish did not terminate LW's employment. (See Finneman's SOF No. 15).

McLeish also opted not to terminate the employment of three white males under his supervision who were violating Delta's "Way We Fly" policy prohibiting tobacco sue in the workplace. More to the point, he did not even investigate this issue. (See Finneman's SOF No. 25).

In sum, an abundance of evidence shows that Delta's proffered reason for termination is pretextual, which in turn shows McLeish's discriminatory intent in making the decision to summarily terminate Finneman's employment.

### E.    McLeish's Sexist Comments and Complaints of Prejudice from Other Employees is Evidence of Discriminatory Intent

McLeish made misogynistic comments about Finneman regarding her "pretty" appearance and her "smell." (See Finneman's SOF No. 17). In September 2017 (only three months before the alleged "incident" regarding Finneman), another Delta employee complained about "prejudice" and "racial discrimination" directed at Pacific Islanders. (See Finneman's SOF No. 14). This evidence further demonstrates Mr. McLeish's discriminatory animus and intent.

### F.    The Same Actor Inference Does Not Apply

Delta argues that Finneman's discrimination claims are undercut by the "same actor inference." (See Delta's Mtn. at pp. 24-25). That inference does not apply for four reasons.

First, the decision to hire Finneman in Salt Lake was made by a team of people. When

Finneman transferred to Salt Lake City from Houston in 2016, Delta's "leadership team" interviewed Finneman, and McLeish could not recall whether he was involved in Finneman's interview. (See Finneman's SOF No. 10). Finneman testified that the decision to invite her to Salt Lake was made by Mr. Stout, Ms. Carson Vaughn, Mr. Stowe, and Mr. McLeish. (See Finneman's response to Delta's SOF No. 12).

Second, the same actor inference is limited to situations where the employee was hired and fired by the same person within a "relatively short time span." *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006). The time period between Finneman's arrival in Salt Lake and her termination was approximately two full years.

And third, the same actor inference is not a presumption. The plaintiff still has the opportunity to present countervailing evidence of pretext. *Id.* at 1183 (internal citation omitted). As noted above, Finneman has shown compelling evidence of pretext, which nullifies any applicability of the same actor inference in this case.

## IV.     Delta Retaliated Against Finneman in Violation of Title VII

Title VII contains an anti-retaliation provision that forbids an employer from discriminating against an individual because that individual "has opposed any practice made an unlawful employment practice" by Title VII. *Pinkerton v. Colo. Dept. of Transp.*, 563 F.3d 1052, 1063 (10th Cir. 2009), citing 42 U.S.C. § 2000e-3(a)

To establish a prima facie case of retaliation, Finneman is required to show: (1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) there is a causal connection between the opposition and the adverse action. *Pittman v. American Airlines, Inc.*, 692 Fed.Appx. 549, 552

(10th Cir. 2017). Plaintiff's burden of establishing a prima facie case of retaliation is "not onerous." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). Further, the plaintiff's prima facie burden is "one of production, not persuasion; it can involve no credibility assessment." *Id.*

Finneman engaged in protected activity on or about October 10, 2017 (shortly after she was not selected for the Administrative OSM position) when she complained to Mr. Stetler. (See Finneman's SOF No. 23). Specifically, Finneman complained that she was subjected to discrimination because she is female with brown skin. (Id.) Accordingly, Finneman satisfies the first element of her prima facie case for retaliation.

As noted above, Delta's termination of Finneman's employment constitutes an adverse employment action, which satisfies the third element. Thus, the only element in dispute is the second element (causation).

While the record shows that Finneman complained to Stetler (as opposed to McLeish), the record also shows that Stetler was involved in McLeish's so-called "investigation" and that he also believed Finneman committed "theft" that warranted her summary termination. (See Finneman's SOF Nos. 26-27). Thus, for the reasons articulated herein, circumstantial evidence exists to show that in making the termination decision, both McLeish and Stetler (acting as agents on behalf of Delta) demonstrated retaliatory intent.

## V.    Delta's Proffered Reason for Termination is Pretextual

Under the *McDonnell Douglas* framework, once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *PVNF, LLC*, 487 F.3d at 800. The same is true of retaliation claims. *Pinkerton*, 563 F.3d at 1063. If the employer meets its burden, the

presumption of discrimination/retaliation raised by the prima facie case is rebutted, and the burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual. *Id*.

Pretext does not require a plaintiff to offer any direct evidence of actual discrimination. *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007). Rather, "pretext can be shown in a variety of ways" and "there is no one specific mode of evidence required to establish the discriminatory inference." *Conroy v. Vilsask*, 707 F.3d 1163, 1172 (10th Cir. 2013).

In *Plotke*, the Tenth Circuit instructed:

> It is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini-trial' to determine the defendant's true state of mind. So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered non-discriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial. **Judgments about intent are best left for trial and are within the province of the jury**.

*Id.* at 1103 (emphasis added) (internal citation omitted)

For the reasons noted in section III, *supra*, Delta's proffered reasons for terminating Finneman's employment (requesting and then waiving the overweight baggage fees, coupled with allegations of untruthfulness in the ensuing "investigation") is a pretext for unlawful discriminatory and/or retaliatory intent. To summarize:

> Delta bypassed its own policy on progressive discipline and failed to consider Finneman's 22 years of service (see section III(A), *supra*);

> Delta's "waiver" allegations against Finneman are false (see section III(B), *supra*);

> McLeish conducted a flawed and biased investigation (see section III(C), *supra*); and

> McLeish demonstrated preferential treatment to white male comparator employees (see section III(D), *supra*).

## REQUEST FOR ORAL ARGUMENT

Pursuant to DUCivR 7-1(f), Finneman requests a hearing and oral argument on Delta's

motion.

## CONCLUSION AND REQUEST FOR RELIEF

The material facts of this action are disputed. Ms. Finneman respectfully requests an

order denying Delta's motion for summary judgment.

Dated this 9th day of December, 2021.

STAVROS LAW P.C.

/s/ Austin B. Egan
Austin B. Egan
*Attorney for Aline Finneman*

## CERTIFICATE OF SERVICE

I certify that on December 9, 2021, I filed this memorandum using the Court's ECF
system, which sent automatic notice to:

David Dibble
Jascha Clark
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145

/s/ Austin B. Egan
Austin B. Egan