## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ALINE FINNEMAN,<br><br>Plaintiff,<br><br>v.<br><br>DELTA AIR LINES, INC.,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:19-cv-327<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Aline Finneman sues her former employer, Delta Air Lines, alleging that Delta discriminated against her because of her race and gender and retaliated against her when she opposed what she considered to be discriminatory conduct—all in violation of Title VII, 42 U.S.C. § 2000e-2. The court grants Delta's motion for summary judgment.

### I.

Ms. Finneman, a woman from the Philippines, was hired by Delta to work as a Customer Service Agent at the Salt Lake City International Airport in June 1995. She worked for Delta for more than two decades and received several promotions, including to the position of Operations Service Manager in April 2014, which required her to relocate to Texas for just over two years. In June 2016, she was transferred back to Salt Lake City, holding the same position until she was terminated in February 2018. That much is not in dispute.

What is in dispute, however, is *why* she was terminated. Ms. Finneman alleges that she applied for an Administrative Operations Service Manager position in September 2017 but was passed over for the position because she is neither white nor male. *See* Pl's Resp., Dkt. No. 55 at 29–30. She made her frustrations with Delta's decision known—including to the employee that

Delta ultimately selected for the position—and claims she was terminated five months later in retaliation for speaking up about the alleged discrimination. But Delta argues that Ms. Finneman was terminated because of events that occurred in December 2017, two months after she was denied the promotion. *See* Def's Mot. Summ. J. (MSJ), Dkt. No. 51 at 11–16.

On December 17, 2017, Ms. Finneman arrived at the Salt Lake City International Airport with her husband and two adult children to travel to the Philippines. Ms. Finneman and her family presented four bags to be checked in. A Delta agent named Niki Alusa informed Ms. Finneman that two of the bags were over Delta's fifty-pound weight limit and were thus subject to an overweight bag fee under Delta policy. Ms. Finneman claims that she instructed her children to redistribute the weight among the family's four bags so that they would each weigh fifty pounds or less, then walked away to handle some Delta business before her flight. *See* Pl's Resp. at 11–12. Ms. Alusa, however, stated that Ms. Finneman repeatedly asked her to waive the overweight baggage fee and to send the bags through as they were, and another witness agreed. *See* Dkt. No. 52-8 at 2; Dkt. No. 52-9 at 2.

In all events, video footage reveals that Ms. Finneman stepped away for a short period during the check-in process, and that while she was gone her children did not redistribute the weight among the bags. Once she returned, Ms. Finneman walked behind the counter, signed into the Delta computer, and checked herself and her family in for the flight. She did not re-weigh the bags or even confirm whether her children had redistributed the weight among the family's bags, *see* Dkt. No. 52-1 at 173:3–14, 176:2–177:1 (Finneman Dep.); instead, as part of the check-in process, she recorded each of the overweight bags as weighing exactly fifty pounds—the precise limit allowed under Delta policy. The bags were checked, and Ms. Finneman went on her vacation as planned.

Delta received an anonymous report regarding the incident three days after it occurred and began an investigation about two weeks later. *See* Dkt. No. 52-11 at 2–3; Dkt. No. 52-12 at 2–3. During the course of that investigation, Ms. Finneman maintained that she never asked anyone to waive her overweight bag fees and that she thought her children had in fact redistributed the weight among the family's bags while she had stepped away so that all of the bags weighed fifty pounds or less when she checked herself and her family in.

Between January 2, 2018, and January 20, 2018, Delta reviewed (1) computer records that confirmed that Ms. Finneman's two overweight bags were both recorded at check-in as weighing fifty pounds; (2) video evidence that confirmed that a verbal exchange occurred between Ms. Finneman and Ms. Alusa, that Ms. Finneman's children did not redistribute the weight among the family's bags, and that Ms. Finneman went behind the counter and checked herself in; and (3) two witness statements—including one by Ms. Alusa—that directly contradicted Ms. Finneman's story that she never requested a fee waiver, as well as two other statements that were consistent with Ms. Alusa's account.[1]

On January 25, 2018, Delta suspended Ms. Finneman. Shortly thereafter, her supervisor, Don McLeish, recommended that she "be terminated for unacceptable conduct as a leader, inappropriately waiving bag fees for herself and her family members and for not being truthful during the investigation." Dkt. No. 52-20 at 2. Two days later, Delta's General Manager and Managing Director of Human Resources both agreed with Mr. McLeish and issued a formal recommendation that Ms. Finneman "should be asked to resign," and "[i]f she refuses, she

---

[1] In total, Delta received six witness statements after the incident: two from Ms. Finneman, and one from each of Niki Alusa, Cory Abbot, Maria Tonga, and Rolando Navarro. *See* Dkt. Nos. 52-8, 52-9, 52-13, 52-15, 52-16. Only Ms. Finneman affirmatively represented that she never requested a fee waiver.

should be terminated." Dkt. No. 52-19 at 2. That recommendation was approved, and Ms. Finneman was terminated on February 2, 2018. *See* Dkt. No. 52-21 at 2.

Ms. Finneman alleges that her termination constituted unlawful discrimination because of her race, color, and gender, and that Delta unlawfully retaliated against her for objecting to the company's decision not to select her for the Administrative Operations Service Manager position in September 2017.[2]

## II.

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Material facts are those which "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "dispute about a material fact is 'genuine'. . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether genuine disputes of material fact exist, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## III.

Because Ms. Finneman's claims are based on circumstantial evidence, the court will analyze them under the well-known *McDonnell Douglass* burden-shifting framework. *See*

---

[2] At earlier stages in this litigation, Ms. Finneman suggested that she may have been subject to additional adverse employment actions. But in opposing Delta's motion for summary judgment, she relied solely on Delta's terminating her employment as the adverse employment action supporting each of her claims. She has therefore forfeited any claims she may have had based on any other adverse employment actions, and the court will not consider any other such actions as independent instances of discrimination or retaliation.

*Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). The test has three parts and proceeds in the following order:

> (1) the plaintiff must establish a prima facie case of discrimination or retaliation; (2) the defendant employer must offer a legitimate non-discriminatory reason for the adverse employment action; and (3) the plaintiff must show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual.

*Id.* If the plaintiff establishes a prima facie case, a rebuttable presumption of wrongful conduct is raised, and it becomes the defendant's burden to "articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000). That burden "is one of production, not . . . persuasion." *Id.* Thus, at this stage a defendant "does not . . . need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion." *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir. 1992) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). All that is required is that a defendant "articulate a reason for the discipline that is not, on its face, prohibited and that is reasonably specific and clear." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (quotation omitted). Should a defendant meet this burden, a plaintiff's claim will survive summary judgment only if the plaintiff can show that the defendant's proffered justifications were pretextual by demonstrating "either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Smothers*, 740 F.3d at 539 (quotation omitted).

To establish a prima facie case of discrimination, Ms. Finneman must "demonstrate (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." *Payan v. UPS*, 905 F.3d 1162, 1168 (10th Cir. 2018) (quotation omitted).

5

To establish a prima facie case of retaliation, she must show "(1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021) (cleaned up).

Although the elements required to establish a prima facie case thus vary based on the specific claim, the *McDonnell-Douglas* burden-shifting framework otherwise applies to all of Ms. Finneman's claims in the same manner. *See Smothers*, 740 F.3d at 538. The court need not decide whether Ms. Finneman has established a prima facie case of discrimination or retaliation because—even assuming that she has—the court concludes that Delta has proffered a sufficiently clear and reasonable explanation for terminating Ms. Finneman and that she has failed to identify evidence that could support a reasonable jury's finding that the explanation was pretextual.

## IV.

Delta argues that Ms. Finneman was terminated for violating its waiver/favor policy by falsely marking her overweight bags as weighing only fifty pounds to avoid paying overweight baggage fees—which it views as theft—and also for lying throughout the investigation that followed. *See* Def's MSJ at 21–22. The court understands Delta's position to be that violating the waiver/favor policy and lying during an investigation are two separate legitimate, nondiscrimatory reasons, each of which justified Ms. Finneman's termination. And it concludes that these justifications are "reasonably specific and clear," and are "not, on [their] face, prohibited." *Frappied*, 966 F.3d at 1058 (quotation omitted). Delta has thus satisfied its burden of production.

Ms. Finneman's claims can thus survive only if she can demonstrate that there is "evidence sufficient to raise a genuine dispute of material fact regarding whether the defendant's articulated reason for the adverse employment action is pretextual." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–49 (2000)). To do so, she must point to evidence "revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Delta's "proffered legitimate reasons for its action such that a reasonable factfinder could rationally find them unworthy of credence and hence infer that [Delta] did not act for the asserted non-discriminatory reason." *Id.* (cleaned up). That showing must rise beyond "mere conjecture" that Delta's proffered explanation "is a pretext for intentional discrimination." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (cleaned up). The law does not require that Delta's conclusion that Ms. Finneman violated its policies be correct or beyond dispute, however. Rather, "the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007) (citation omitted); *see also Rivera v. City and Cty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004).

The court concludes that Ms. Finneman has failed to identify any evidence that could support a reasonable jury's finding that Delta's proffered justification that Ms. Finneman violated the waiver/favor policy was pretextual.

## A.

To be sure, Ms. Finneman disputes that she ever requested a baggage fee waiver and instead asserts that she asked her children to rearrange the items across the bags to avoid an overweight baggage fee.

But it is undisputed that Ms. Finneman's children did not in fact rearrange the items in the suitcases, and that Ms. Finneman neither asked her children whether they had done so nor reweighed the overweight bags before checking in. *See* Finneman Dep. at 173:3–14, 176:2–177:1. And undisputed evidence establishes that it was impossible to check bags without entering a weight for each bag during the check-in process, that a weight of 50 pounds was entered for each of the two overweight bags, and that Ms. Finneman checked herself and her family in. It follows that she must have entered these weights. While there may thus be a genuine dispute regarding whether Ms. Finneman violated Delta's waiver/favor policy willfully—as the testimony of the other witnesses to the incident suggests—or merely negligently or recklessly—as her own testimony suggests, there is no dispute that Ms. Finneman entered false weights for her bags and thus evaded the required fees for her overweight bags.

Delta's policies state that "[t]heft and [m]isappropriation are [p]rohibited," and that it considers providing "[u]nauthorized waivers or favors such as blocking seats or waiving fees or eligibility requirements for given fares or inventory" to constitute theft. Dkt. No. 52-3 at 6. Ms. Finneman testified in her deposition that she reviewed this policy, understood it, and understood that Delta would take disciplinary action for violations of its policies. *See* Finneman Dep. at 116:13–119:10. Ms. Finneman also conceded that she knew of other Delta employees who had been terminated for violating the waiver/favor policy. *See id.* at 163:9–24. And although she was able to identify other employees who were not terminated after violating *other* policies, she was unable to identify any employee who was not terminated after violating the waiver/favor policy.

Ms. Finneman has not identified any policy or evidence suggesting that Delta was required to determine that her violation of this policy was intentional—as opposed to reckless or negligent—in order to terminate her. Nor did Delta's decision to terminate Ms. Finneman for

violating this policy without first providing coaching contravene any other Delta policy. To the contrary, the relevant Delta policy provides that

> When an employee fails to follow Delta's policies or meet performance requirements, any decision to take disciplinary action or terminate employment is made only after a rigorous process of review and *usually* only after an employee has received prior coaching. Of course, in some situations, the behavior or policy violation may be so serious that it, *in and of itself*, may warrant review for termination.

Dkt. No. 52-3 at 5 (emphasis added). Ms. Finneman concedes that under the plain language of this policy, progressive discipline was not required. And although Ms. Finneman argues that Delta's decision to terminate her did not adequately account for her twenty-two years working for the airline, *see* Pl's Resp. at 35,41–42, it is hardly surprising that, given the nature of Ms. Finneman's violation, Delta viewed her extensive experience—including in supervisory positions—as an aggravating rather than a mitigating circumstance and concluded, in light of that experience, that her violation of the policy did not result from a lack of adequate coaching.

Given that Ms. Finneman has failed to present evidence that this stated reason for her termination was false, that Delta acted contrary to a written company policy, or that Ms. Finneman was treated differently from other similarly situated employees, she has failed to establish any of the typical indicia of pretext. *See Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1312 (10th Cir. 2017).

## B.

Ms. Finneman nevertheless seeks to support her arguments for pretext by arguing that Delta's investigation was flawed, that Mr. McLeish had previously "made misogynistic comments" about her, Pl's Resp. at 29, and that another employee had raised "[a]llegations of discrimination directed at Pacific Islanders," *id*. at 28–29. The court will consider each of these arguments in turn.

With respect to the investigation, Ms. Finneman argues that Mr. McLeish did not share adverse witness statements and documents with her or allow her to respond to these statements, *see id.* at 20, that he did not interview all of the individuals who may have had knowledge of relevant facts, *see id.* at 37, that he did not personally observe the events, *see id.* at 18, that no Delta policy prohibited Ms. Finneman from checking herself in, *see id.*, and that the video footage of the incident did not have audio, *see id.* at 19.

But of course Ms. Finneman was fired for violating the waiver/favor policy, not for checking herself in. And although Ms. Finneman criticizes how Delta conducted its investigation and questions whether the evidence it collected was sufficient to support the conclusion it reached, she has failed to identify any evidence that undermines Delta's conclusion that she violated the waiver/favor policy. To the contrary, as already explained, the undisputed evidence before the court clearly establishes that Ms. Finneman did violate this policy. As a result, even if Delta could have theoretically conducted a more thorough investigation, a reasonable jury could not find that the actual investigation it did conduct rendered Delta's decision pretextual.

As for Mr. McLeish's "misogynistic comments," Ms. Finneman clarified at her deposition that Mr. McLeish "made a comment one time," and that his comment was that "[i]f we can have all of our OSMs look pretty – look as pretty as Aline and smelling [as] good as Aline, then we won't have so many people com – so many of our agents complaining." Finneman Dep. at 257:5–10. Ms. Finneman also acknowledged that the substance of Mr. McLeish's "one discriminatory comment" was that she was "attractive." *Id*. at 257:13–15. While Mr. McLeish's remark may have been "archaic and unsuitable for the twenty-first century workplace," *Didier v. Abbott Labs.*, 614 F. App'x 366, 373 (10th Cir. 2015), it is hardly indicative of discriminatory animus. And even if it were, Ms. Finneman has presented no

evidence that it was anything more than a stray comment. *Cf. Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (explaining that a plaintiff cannot establish a hostile work environment that violates Title VII "by demonstrating 'a few isolated incidents of . . . enmity' or 'sporadic . . . slurs'" (citation omitted)).

Finally, in support of her argument that another Delta employee had raised "[a]llegations of discrimination directed at Pacific Islanders," Pl's Resp. at 28–29, Ms. Finneman identifies an email from a Delta employee named Taniela Pahulu to Marc Stetler, a senior Salt Lake City–based Delta employee a few months before Ms. Finneman was terminated. And to be sure, in her email, Ms. Pahulu states that she "was full of a lot of mixed feelings and emotions," including "Anger, Unfairness, Threaten, Abuse of Authority, Preferential Treatment, Hostile Work Environment, Profiling, Targeted, Inconsistency, Prejudice, and undertones of Racial Discrimination of Pacific Islanders of Tongan Descent." Dkt. No. 55-10 at 2. The problem for Ms. Finneman is that Ms. Pahulu's email identifies "having to deal with" *her*—Ms. Finneman—along with another Delta employee not involved in Ms. Finneman's termination, as the source of those feelings: "I was full of a lot of mixed feelings and emotions concerning the last days of training having to deal with *OSM Aline Finneman*." *Id.* (emphasis added). In her email, Ms. Pahulu further wrote that, after speaking with Mr. Stetler, she "felt at ease with everything," trusted that Mr. Stetler could "find the proper resolution to the things [they] . . . discussed," and hoped "the complaints that [she] brought to light . . . will help change the work culture for the better . . . especially in the Deice program and the trainers involved in it." *Id.*

The court has little difficulty concluding that none of the evidence supporting these arguments—whether considered individually or in combination with the other evidence

11

identified by Ms. Finneman, *see Bekkem v. Wilkie*, 915 F.3d 1258, 1270–71 (10th Cir. 2019)—could support a reasonable jury's finding of pretext.

### C.

In short, "the record conclusively reveal[s]" that Ms. Finneman did violate Delta's waiver/favor policy—and thus conclusively establishes that there was *in fact* a "nondiscriminatory reason" for Delta to terminate her. *Reeves*, 530 U.S. at 148. And Ms. Finneman has identified nothing in the record that could support a reasonable jury's finding that Delta's invocation of this reason for its action was pretextual. It follows that "no rational factfinder could conclude that the action was discriminatory."[3] *Id.*

\* \* \*

For the foregoing reasons, Delta's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

---

[3] As noted, Delta also justified Ms. Finneman's termination on the ground that she lied during the investigation. Given that all of the other witnesses to the incident contradicted Ms. Finneman's account of what happened and that the video evidence is consistent with their accounts, as well as the overall paucity of evidence supporting Ms. Finneman's arguments of pretext (as discussed), it seems highly unlikely that a reasonable jury could find that Delta did not "honestly believ[e]" that Ms. Finneman had lied during the investigation and "ac[t] in good faith upon" that belief. *Riggs*, 497 F.3d at 1119; *see also Dewitt*, 845 F.3d at 1310 ("[It] bears underscoring that . . . it is ultimately immaterial whether [the Defendant]'s belief was actually correct . . . ."). But even assuming a reasonable jury could so find, the court does not believe that such a finding with respect to this additional justification could support an ultimate finding of discrimination in the circumstances of this case, where Ms. Finneman has at most "created only a weak issue of fact" regarding Delta's determination that she lied during the investigation and "the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision"—namely that Ms. Finneman violated the waiver/favor policy. *Reeves*, 530 U.S. at 148.

DATED this 21st day of July, 2022.

BY THE COURT:

_____

Howard C. Nielson, Jr.
United States District Judge

13